**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Appellees,**

**v.**

**Rogers C. B. MORTON, in his official capacity as Secretary of the Department of Interior, et al., Appellants.**

**No. 71-2031.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 20, 1971.

Decided Jan. 13, 1972.

---

Mr. Edmund B. Clark, Atty., for the Department of Justice, with whom Messrs. Shiro Kashiwa, Asst. Atty. Gen., and Thomas L. McKevitt, Atty., Department of Justice, were on the pleadings for appellants.

Mr. Thomas B. Stoel, Jr., Washington, D. C., for appellees.

Mr. John H. Pickering, Washington, D. C., Attorney for Chevron Oil Company, by special leave of Court was permitted to file a suggestion as amicus curiae.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

LEVENTHAL, Circuit Judge:

This appeal raises a question as to the scope of the requirement of the National Environmental Policy Act (NEPA) [1] that environmental impact statements contain a discussion of alternatives. Before us is the Environmental Impact Statement filed October 28, 1971, by the Department of Interior with respect to its proposal, under § 8 of the Outer Continental Shelf Lands Act,[2] for the oil and gas general lease sale, of leases to some 80 tracts of submerged lands, primarily off eastern Louisiana. The proposal was finally structured so as to embrace al-

---

1. *See, e. g.*, Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission, 449 F.2d 1109, (D.C.Cir. 1971); Committee for Nuclear Responsibility, Inc. v. Seaborg, No. 71–1732, October 5, 1971.

2. 43 U.S.C. § 1337 (1970). This Act, P.L. 83–212, appears at 43 U.S.C. § 1331 et seq.

most 380,000 acres, about 10% of the offshore acreage presently under Federal lease. Opening of bids for the leases was scheduled for December 21, 1971, and three conservation groups [3] brought this action on November 1, to enjoin the proposed sale. On December 16, the District Court held a hearing and granted a preliminary injunction enjoining the sale of these leases pending compliance with NEPA. The Government appealed, and filed a motion in this court for summary reversal and immediate hearing. We granted the immediate hearing, and on December 20, heard the presentations and issued an order permitting the bids to be received on condition they remain unopened pending further order of the court. As to the motion for summary reversal, we conclude that this must be denied.

## I. BACKGROUND

A. *Chronology and Impact Statements*

On June 15, 1971, Secretary of Interior Rogers Morton, a defendant in this litigation, announced that a general oil and gas lease sale of tracts on the Outer Continental Shelf (OCS) off eastern Louisiana would take place in December, 1971. This was responsive to the directive in President Nixon's June 4, 1971, Message on Supply of Energy and Clean Air.[4] On July 31, 1971, Mr. Burton W. Silcock, Director of the Bureau of Land Management, also a defendant, promulgated and circulated for comment a "Draft Environmental Impact Statement" pursuant to § 102(2) (C) of NEPA and § 10(b) of the Guidelines of the Council on Environmental Quality.[5] Plaintiffs submitted comments on this draft statement. Hearings were held in September, 1971, in New Orleans, at which oral testimony was presented. On October 28, 1971, Mr. Silcock promulgated the "Final Environmental Impact

Statement," (hereafter Statement), 36 Fed.Reg. 20707 (1971). On November 20, 1971, the Interior Department announced that the proposed lease sale would take place, that 80 tracts would be offered for leasing, and that sealed bids would be received until December 21.

*Statement—Adverse Environmental Impact Disclosed*

While the Statement presents questions, subsequently delineated, this document—67 pages in length, exclusive of appendices—is not challenged on the ground of failure to disclose the problems of environmental impact of the proposed sale. On the contrary, these problems are set forth in considerable range and detail. Indeed, the complaint voiced by the Audubon Society's witness in testimony was that the draft Statement gives a green light for the sale while its contents seem to cry out for the opposite conclusion. Without purporting to summarize, we identify some of the Statement's highlights:

Adjacent to the proposed lease area is the greatest estuarine coastal marsh complex in the United States, some 7.9 million acres, providing food, nursery habitat and spawning ground vital to fish, shellfish and wildlife, as well as food and shelter for migratory waterfowl, wading birds and fur-bearing animals. This complex provides rich nutrient systems which make the Gulf of Mexico, blessed also with warm waters and shallow depths, the most productive fishing region of the country. It yielded $71 million of fish and shellfish to Louisiana and Mississippi commercial fishermen in 1970, and some 9 million man-days of sport fishing.

The coastal regions of Louisiana and Mississippi contain millions of acres suitable for outdoor recreation, with a number of state and federal recreation areas, and extensive beach shorelines

---

3. Natural Resources Defense Council, Inc., Friends of the Earth, Inc., Sierra Club, Inc.

4. The text of this Message appears at 112 Cong.Rec.S. 8313–17 (June 4, 1971).

5. *See* 36 F.R. 7724 (1971) for the Council's Guidelines for the preparation of Statements on Proposed Federal Actions Affecting the Environment.

(397 miles for Louisiana, and 100 miles for Mississippi). These serve millions —not only the residents of the seven-state region (23 million in all; 10 million within 250 miles of the coast), but visitors attracted to the beaches in increasing numbers (estimated at 3.5 millions within five years and ultimately 10 millions).

As to probable impact of issuance of leases on the environment the Statement did not anticipate continuation of debris from drilling operations, in view of recent regulations prohibiting dumping of debris on the OCS. The Statement acknowledged some impact from construction of platforms, pipelines and other structures. A concluding section (III D) on "Unavoidable Adverse Environmental Effects" particularly noted the destruction of marsh and of marine species and plants from dredging incident to pipeline installation, and the effect of pipeline canals in e. g., increasing ratio of water to wetlands and increasing salt water intrusion.

Oil pollution is the problem most extensively discussed in the Statement and its exposition of unavoidable adverse environmental effects. The Statement acknowledges that both short and long term effects on the environment can be expected from spillage, including in that term major spills (like that in the Santa Barbara Channel in 1969); minor spills from operations and unidentified sources; and discharge of waste water contaminated with oil.

These adverse effects relate both to the damage to the coastal region—beaches, water areas and historic sites; and the forecast that oil pollution "may seriously damage the marine biological community"—both direct damage to the larger organisms, visible more easily and sooner, and to smaller life stages which would lead one step removed to damage later in the food chain.

The Statement noted the diverse conclusions and comments in existing reports on oil spills, some minimizing damage done, others stressing that oil spillage has effects beyond the period of visible evidence; that oil may mix with water, especially in a turbulent sea, and disperse downward into the sea; that emulsifiers used to remove surface oil may have toxic consequences, etc.

The Statement asserted that while past major spills in the Gulf resulted in minimal damage, this was due to a fortunate combination of offshore winds and surface currents. The Statement rates blocks in the sale on an estimated probability of impact basis, calculated principally on proximity to high value/critically vulnerable area.

C. *Statement—Discussion of Alternatives*

Section IV of the Statement, containing its discussion of Alternatives, is attached as an Appendix. Subsection A deals with possible modifications to delete tracts with higher environmental risks. Government counsel advises that, in order to lessen environmental risk, the acreage covered by the proposed sale was reduced from that originally contemplated, with the withdrawal of eight of the tracts most nearly located to the Delta Migratory Waterfowl Refuge.

Subsection IV B ("Withdraw Sale"), containing the material principally involved in this case, will be discussed subsequently in this opinion.

D. *Ruling of District Court*

The District Court recognized both that there is a profound national energy crisis and that the Outer Continental Shelf has been a prolific source of oil and gas. But it further noted that the Shelf, in President Nixon's words, "has been the source of troublesome oil spills in recent years." The Court found that the Statement failed to provide the "detailed statement" required by NEPA of environmental impact and alternatives. The Court stated:

The Court finds that the defendants failed to comply with NEPA by failing to discuss some alternatives at all, such as meeting energy demands by federal legislation or administrative action freeing current onshore and state-controlled offshore production from state

market demand prorationing or a change in the Federal Power Commission's natural gas pricing policies. In addition the defendants only superficially discussed the alternatives listed in their Final Impact Statement, and they failed to discuss in detail the environmental impacts of the alternatives they listed in the statement. The Court does not wish to give the impression that it believes the alternatives are better than the proposed lease sale, but it believes that these alternatives must be explored and discussed thoroughly in order to comport with the intent and requirements of Section 4332(2) (C) of NEPA.

.E. *Scope of Appellate Consideration*

■ We pause before our discussion of the meaning of NEPA to take note of plaintiffs' contention that the Government's motion should be denied because the granting or denial of a preliminary injunction calls for the exercise of judicial discretion, and is not to be disturbed on appeal except on a finding of abuse or improvident exercise of judicial discretion.[6] And a party moving in an appellate court for a summary reversal— *i. e.,* on motion papers, without usual briefs and full argument—has a "heavy burden of demonstrating both that his remedy is proper and that the merits of his claim so clearly warrant relief as to justify expeditious action." [7]

■ However, a greater amplitude of judicial review is called for when the appeal presents a substantial issue that the action of the trial judge was based on a premise as to the pertinent rule of law that was erroneous. Not only the avowed forecast as to probability of success on the merits, but also the analysis of injury to either or both parties, the public interest, and the balancing of interests,

may well come to depend on an assumption of underlying legal premise. When this can be identified, the appellate court furthers the interest of justice by providing a ruling on the merits to the extent that the matter is ripe, though technically the case is only at the stage of application for preliminary injunction.[8] And a reversal based on a disagreement with the underlying legal premise of the trial court is not based on, or to be construed as, a determination of arbitrary abuse of judicial discretion.[9]

■ Similarly this court's function extends to disposition on motion for summary reversal—when the critical issue in cases of public moment, and the appraisal of the possibility of irreparable harm to the public interest, depend on the applicable legal premise. This conception of the motion for summary reversal does not require that the case be free of troublesome issues, but is rather based on the approach that there is a public interest in expedition in extraordinary cases, whether the appeal is brought by the Government or others, and that the case is ripe for decision, e. g., is unlikely to turn significantly on fact findings or further legal researches, as in legislative history.

Although the case is not presented on customary printed briefs the court has the benefit of the legal researches and positions of the parties. While it is typical for oral argument on such motions to be scheduled initially at 15 minutes per side, it is also typical for time to be extended in accordance with the needs of counsel and the court and the complexity of the issues.

The present case is one of public moment, where expedition should be provided if possible. While the application was for a preliminary injunction, the District Court properly made its deter-

**6.** *See* Meccano, Ltd. v. Wanamaker, 253 U.S. 136, 141, 40 S.Ct. 463, 64 L.Ed. 822 (1920) ; A Quaker Action Group v. Hickel, 137 U.S.App.D.C. 176, 180, 421 F.2d 1111, 1115 (1969).

**7.** United States v. Allen, 133 U.S.App.D.C. 84, 85, 408 F.2d 1287, 1288 (1969).

**8.** *See* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 584–585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

**9.** *See* Delaware and Hudson Ry. Co. v. United Transportation Union, 146 U.S. App.D.C. 142, 450 F.2d 603 (1971).

mination on the basis of underlying legal assumptions. We think it appropriate to give full consideration to the Government's motion for summary reversal, and to the issue, insofar as ripe for determination, of the rightful scope of NEPA's requirement as to alternatives.

## II. DISCUSSION OF REQUIREMENT OF NEPA AS TO ALTERNATIVES

The pertinent instruction of Congress appears in § 102 of NEPA, 42 U.S.C. § 4332:

The Congress authorizes and directs that, to the fullest extent possible:

\* \* \* \* \* \*

(2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

\* \* \* \* \* \*

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.

Paragraph (iii) of § 102(2) (C) is a terse notation for: "The alternative ways of accomplishing the objectives of the proposed action and the results of not accomplishing the proposed action." [10]

Congress contemplated that the Impact Statement would constitute the environmental source material for the information of the Congress as well as the Executive, in connection with the making of relevant decisions, and would be available to enhance enlightenment of —and by—the public.[11] The impact statement provides a basis for (a) evaluation of the benefits of the proposed project in light of its environmental risks, and (b) comparison of the net balance for the proposed project with the environmental risks presented by alternative courses of action.[12]

---

10. This is the language of the Section-by-Section Analysis presented by Senator Jackson, in charge of the legislation and chairman of the Senate Interior Committee, in explaining and recommending approval of the bill as agreed in conference. 115 Cong.Rec. 40420 (Dec. 20, 1969).

11. See Committee for Nuclear Responsibility, Inc. v. Seaborg, No. 71–1732, October 5, 1971, slip opin., p. 7; No. 71–1854, October 28, 1971, slip opin., pp. 2, 12.

12. The legislative history indicates the importance of this source of environmental

input into the decision making process. See S.Rep.No.91–296, 91st Cong., 1st Sess., 21:

. . . the agency shall develop information and provide descriptions of the alternatives in adequate detail for subsequent reviewers and decision makers, both within the executive branch and the Congress, to consider the alternatives along with the principle recommendations.

That the impact statement is the proper instrument to provide this focus is recognized by the guidelines promulgated by the Council on Environmental Quality:

A rigorous exploration and objective evaluation of alternative actions that

*Need to discuss environmental consequences of alternatives*

██ We reject the implication of one of the Government's submissions which began by stating that while the Act requires a detailed statement of alternatives, it "does not require a discussion of the environmental consequences of the suggested alternative." [13] A sound construction of NEPA, which takes into account both the legislative history and contemporaneous executive construction (see notes 10 and 12), requires a presentation of the environmental risks incident to reasonable alternative courses of action. The agency may limit its discussion of environmental impact to a brief statement, when that is the case, that the alternative course involves no effect on the environment, or that their effect, briefly described, is simply not significant. A rule of reason is implicit in this aspect of the law as it is in the requirement that the agency provide a statement concerning those opposing views that are responsible.[14]

*Alternative as to oil import quotas*

██ We think the Secretary's Statement erred in stating that the alternative of elimination of oil import quotas was entirely outside its cognizance. Assuming, as the Statement puts it, that this alternative "involves complex factors and concepts, including national security, which are beyond the scope of this statement," it does not follow that the Statement should not present the en-

vironmental effects of that alternative. While the consideration of pertinent alternatives requires a weighing of numerous matters, such as economics, foreign relations, national security, the fact remains that, as to the ingredient of possible adverse environmental impact, it is the essence and thrust of NEPA that the pertinent Statement serve to gather in one place a discussion of the relative environmental impact of alternatives.

The Government also contends that the only "alternatives" required for discussion under NEPA are those which can be adopted and put into effect by the official or agency issuing the statement. The Government seeks to distinguish the kind of impact statement required for a major Federal action from that required with a legislative proposal.[15] And it stresses that the objective of the Secretary's action was to carry out the directive in the President's clean energy message of June 4, 1971.

While we agree with so much of the Government's presentation as rests on the assumption that the alternatives required for discussion are those reasonably available, we do not agree that this requires a limitation to measures the agency or official can adopt. This approach would be particularly inapposite for the lease sale of offshore oil lands hastened by Secretary Morton in response to the directive which President Nixon set forth in his message to Congress on the Supply of Energy and Clean Air, as part of an overall program of development to provide an accommo-

---

might avoid some or all of the adverse effects is essential. Sufficient analysis of such alternatives and their costs and impact on the environment should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might have less detrimental effects.
36 F.R. 7724, 7725 (1971).

13. Defendants' Memorandum of Points and Authorities, Dec. 8, 1971, p. 7.

14. Committee for Nuclear Responsibility, Inc. v. Seaborg, October 5, 1971, slip opin., p. 7.

15. *See* Defendants' Memorandum, Dec. 8, 1971, at 11:
 When proposing legislation the responsible official may properly be expected to consider alternative methods of achieving the same goal which require legislation, because his impact statement is to assist the Congress in determining how it should act and the Congress is able to enact any legislation within the scope of the Constitution. When the responsible official is considering a major Federal action which he is to take himself, he is properly concerned only with those alternatives which he himself has discretion to adopt.

dation of the energy requirements of our country with the growing recognition of the necessity to protect the environment. The scope of this project is far broader than that of other proposed Federal actions discussed in impact statements, such as a single canal or dam.[16] The Executive's proposed solution to a national problem, or a set of inter-related problems, may call for each of several departments or agencies to take a specific action; this cannot mean that the only discussion of alternatives required in the ensuing environmental impact statements would be the discussion by each department of the particular actions it could take as an alternative to the proposal underlying its impact statement.

When the proposed action is an integral part of a coordinated plan to deal with a broad problem,[17] the range of alternatives that must be evaluated is broadened. While the Department of the Interior does not have the authority to eliminate or reduce oil import quotas, such action is within the purview of both Congress and the President, to whom the impact statement goes. The impact statement is not only for the exposition of the thinking of the agency, but also for the guidance of these ultimate decision-makers, and must provide them with the environmental effects of both the proposal and the alternatives, for their consideration along with the various other elements of the public interest.

An evaluation of the environmental effects of all the alternatives in the area of the energy crisis might have been provided by an impact statement issued by an officer or agency with broad responsibility. This could have been done in June, 1971, when the President abstained from exercising his authority to invoke a change in import quota administration and issued the Message that included the directive as to offshore leasing. This course would have been in furtherance of the NEPA objective of securing impact statements in case of a "major Federal action significantly affecting the quality of the human environment," though we do not suggest it was improper to defer the impact statement from the time of programmatic directive to the time of the implementing specific actions. The impact statement function could have been assigned to the group designated by the President to coordinate and analyze overall energy questions for the executive branch—the Energy Subcommittee of the Domestic Council.[18] In the absence of assignment of the impact statement function to an agency with broader responsibility, the implementation of the statutory requirement of the environmental review mandated by NEPA fell on the Interior Department when it took the first step in carrying out the broader energy program.

In defense of the Statement as written Government counsel suggest that nothing else was required because it was apparently assumed that there would be no adverse environmental impact from increased imports. This was not stated—and, for all we know, a contrary implication may have been intended by the Statement (at p. 37) when it referred to the problem of spillage from drilling as not even approaching the pollution from routine discharges of tankers and other vessels. As to this contention—like another statement of counsel, unsupported in the record, that offshore

16. *See, e. g.,* Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 749 (E.D.Ark.1971) (dam), Environmental Defense Fund v. Corps of Engineers, 2 E.R.C. 1173 (D.D.C.1971) (canal).

17. The President's message set out eleven areas of research and development toward the goal of clean energy; three areas of making available the energy resources of

federal lands, including the leasing of offshore oil lands; and further discussed six other aspects of the overall problem.

18. In his message to Congress, the President designated the Energy Subcommittee as the body with the power to make overall policy in the field until his proposed Department of Natural Resources comes into being. 112 Cong.Rec. 8317.

drilling has less adverse environmental impact than onshore drilling because the oil produced has lower sulfur content— our comment is simply this: The subject of environmental impact is too important to relegate either to implication or to subsequent justification by counsel.[19] The Statement must set forth the material contemplated by Congress in form suitable for the enlightenment of the others concerned.

■ The need for continuing review of environmental impact of alternatives under NEPA cannot be put to one side on the ground of past determinations by Congress or the President. We are aware that the 1953 Outer Continental Shelf Lands Act contains a finding of an urgent need for OCS development and authorization of leasing. Similarly we are aware that the oil import quota program was instituted by the President on a mandatory basis in 1959, following earlier voluntary programs, and that the President's authority, based on national security considerations, is contained in legislation derived from a 1955 enactment and subsequent amendments, 19 U.S.C. § 1862. But these enactments are not dispositive. As to both programs Congress contemplated continuing review. The OCS leasing was specifically made subject to executive authority to withdraw unleased lands from disposition from time to time, 43 U.S.C. § 1341(a). Import controls were from the outset dependent on continuing Presidential findings as to the nature and duration of controls deemed necessary. A Cabinet Task Force on Oil Import Control was created in March, 1969, to conduct a review of mandatory oil import restriction and its report, in February, 1970, recommended a substantial change in the method and direction of import controls.

What NEPA infused into the decision-making process in 1969 was a directive as to environmental impact statements that was meant to implement the Congressional objectives of Government coordination, a comprehensive approach to environmental management, and a determination to face problems of pollution "while they are still of manageable proportions and while alternative solutions are still available" rather than persist in environmental decision-making wherein "policy is established by default and inaction" and environmental decisions "continue to be made in small but steady increments" that perpetuate the mistakes of the past without being dealt with until "they reach crisis proportions." S.Rep.No.91–296, 91st Cong., 1st Sess. (1969) p. 5.

■ We reiterate that the discussion of environmental effects of alternatives need not be exhaustive. What is required is information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned. As to alternatives not within the scope of authority of the responsible official, reference may of course be made to studies of other agencies—including other impact statements. Nor is it appropriate, as Government counsel argues, to disregard alternatives merely because they do not offer a complete solution to the problem. If an alternative would result in supplying only part of the energy that the lease sale would yield, then its use might possibly reduce the scope of the lease sale program and thus alleviate a significant portion of the environmental harm attendant on offshore drilling.

*Other "alternatives"*

The foregoing establishes that we cannot grant the Government's motion

19. *Cf.*, Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ; Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 411, 379 F.2d 453, 465 (1967) ; National Air Carrier Assn. v. CAB, 141 U.S.App.D.C. 31, 41, 436 F.2d 185, 195 (1970). While these cases relate to fact findings, this aspect—the need for agency statement, as opposed to counsel's rationalization—is a requirement that applies to environmental impact statements.

for summary reversal. We discuss other aspects of the case in anticipation that the Secretary may choose to supplement or modify the Statement—perhaps even, assuming approval by the District Court, in an effort to open the sealed bids without a new offering.

We think there is merit to the Government's position insofar as it contends that no additional discussion was requisite for such "alternatives" as the development of oil shale, desulfurization of coal, coal liquefaction and gasification, tar sands and geothermal resources.

The Statement sets forth (see Appendix) that while these possibilities hold great promise for the future, their impact on the energy supply will not likely be felt until after 1980, and will be dependent on environmental safeguards and technilogical developments. Since the Statement also sets forth that the agency's proposal was put forward to meet a near-term requirement, imposed by an energy shortfall projected for the mid-1970's, the possibility of the environmental impact of long-term solutions requires no additional discussion at this juncture. We say "at this juncture" for the problem requires continuing review, in the nature of things, and these alternatives and their environmental consequences may be more germane to subsequent proposals for OCS leases, in the light of changes in technology or in the variables of energy requirements and supply.

 Furthermore, the requirement in NEPA of discussion as to reasonable alternatives does not require "crystal ball" inquiry. Mere administrative difficulty does not interpose such flexibility into the requirements of NEPA as to undercut the duty of compliance "to the fullest extent possible." [20] But if this requirement is not rubber, neither is it iron. The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious,

that the resources of energy and research—and time—available to meet the Nation's needs are not infinite.

Still different considerations are presented by the "alternatives" of increasing nuclear energy development, listed in the Statement, and the possibilities, identified by the District Court as a critical omission, of federal legislation or administrative action freeing current offshore and state-controlled offshore production from state market demand prorationing, or changing the Federal Power Commission's natural gas pricing policies.

 The mere fact that an alternative requires legislative implementation does not automatically establish it as beyond the domain of what is required for discussion, particularly since NEPA was intended to provide a basis for consideration and choice by the decision-makers in the legislative as well as the executive branch. But the need for an overhaul of basic legislation certainly bears on the requirements of the Act. We do not suppose Congress intended an agency to devote itself to extended discussion of the environmental impact of alternatives so remote from reality as to depend on, say, the repeal of the antitrust laws.

In the last analysis, the requirement as to alternatives is subject to a construction of reasonableness, and we say this with full awareness that this approach necessarily has both strengths and weaknesses. Where the environmental aspects of alternatives are readily identifiable by the agency, it is reasonable to state them—for ready reference by those concerned with the consequences of the decision and its alternatives. As already noted, the agency may make references to studies already made by other agencies (including impact statements) or appearing in responsible journals.

There is reason for concluding that NEPA was not meant to require detailed discussion of the environmental

---

**20.** See NEPA § 102, quoted above.

effects of "alternatives" put forward in comments when these effects cannot be readily ascertained and the alternatives are deemed only remote and speculative possibilities, in view of basic changes required in statutes and policies of other agencies—making them available, if at all, only after protracted debate and litigation not meaningfully compatible with the time-frame of the needs to which the underlying proposal is addressed.

■ A final word. In this as in other areas, the functions of courts and agencies, rightly understood, are not in opposition but in collaboration, toward achievement of the end prescribed by Congress.[21] So long as the officials and agencies have taken the "hard look"[22] at environmental consequences mandated by Congress, the court does not seek to impose unreasonable extremes or to interject itself within the area of discretion of the executive as to the choice of the action to be taken.[23]

Informed by our judgment that discussion of alternatives may be required even though the action required lies outside the Interior Department, the Secretary will, we have no doubt, be able without undue delay to provide the kind of reasonable discussion of alternatives and their environmental consequences that Congress contemplated.

Motion denied.

## APPENDIX

Excerpt from Final Environmental Impact Statement on Proposed 1971 Outer Continental Shelf Oil and Gas General Lease Sale Offshore Eastern Louisiana Prepared by the Deartment of the Interior

IV. *Alternatives to the Proposed Action*

### A. *Hold the Sale in Modified Form*

The proposed sale could be held by offering only those tracts determined to have a lower potential for environmental risks. Those tracts believed to have high environmental risks could be deleted from the sale and considered for offering at a later date, should improved technology or other circumstances warrant.

This alternative could also allow for special stipulations on any proposed tract where additional requirements might be necessary to protect the environment or to minimize or eliminate possible conflicts with or potential damage to other resource values or commercial uses of the Gulf of Mexico and the adjacent land areas.

### B. *Withdraw Sale*

The proposed sale could be withdrawn from consideration for leasing on the basis of possible environmental impact. If such a decision were made, new domestic sources of clean energy would need to be developed. In the long run, new technology must be made available to produce clean energy at a cost to help offset the critical need for oil and gas; in the short run, few alternatives exist and the ones that do exist are of questionable practicability. The following possible sources of energy for short-run needs are "alternatives"[1] to offshore oil and gas.

21. *Cf.*, United States v. Morgan, 307 U.S. 183, 191, 59 S.Ct. 795, 83 L.Ed. 1211 (1939); Niagara Mohawk Power Corp. v. FPC, 126 U.S.App.D.C. 376, 383, 379 F.2d 153, 160 (1967); Greater Boston Television Corp. v. FCC, 444 F.2d 841, 851 (D.C.Cir. 1970), cert. denied 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701, June 14, 1971.

22. *Cf.*, WAIT Radio v. FCC, 135 U.S. App.D.C. 317, 418 F.2d 1153 (1969);

Greater Boston TV Corp. v. FCC, *supra*, 444 F.2d at 851.

23. *See* Calvert Cliff's Coordinating Committee, Inc., *supra* note 1, 449 F.2d at 1115.

1. In many cases, they are not necessarily alternatives, but are supplemental to other sources. The national energy requirement exceeds the potential of any one "alternative."

Many of these alternatives have their individual environmental effects which must be considered: however, analysis of these impacts is beyond the scope of this statement.

1. Eliminations of import quotas.
2. Increase onshore exploration and development.
3. Development of oil shale.
4. Increase nuclear energy development.
5. Increase use of low sulfur coal and/or desulfurization of coal.
6. Development of coal liquification [*sic*] and gasification.
7. Development of geothermal resources.
8. Development of tar sands.

While the elimination of oil import quotas could be an alternative to continued development of offshore oil and gas, such a determination involves complex factors and concepts, including national security, which are beyond the scope of this statement. The remaining alternative energy sources should best be considered as supplements, not true alternatives in the short run (e. g. 5 to 15 years). While the development of oil shale, nuclear energy, desulfurization of coal, coal liquification, [*sic*] coal gasification, tar sands and geothermal resources hold great promise for the future, their impact on the energy supply will not likely be felt until after 1980, and will be dependent on environmental safeguards and technological developments. Until recently, the petroleum industry has been able to satisfy domestic demand for oil and gas from the onshore areas. With the exception of Alaska, however, current seismic exploration techniques have not been able to identify sufficient numbers of new prospective oil and gas bearing geologic structures onshore that are suitable for further exploration or development investments. This has been reflected by a significant decline in both onshore drilling and proved reserves. In contrast, however, the geologic structures in the relatively unexplored or virgin areas are more easily identifiable using current seismic technology.

C. *Delay Sale Until New Technology is Available to Provide Increased Environmental Protection*

Since basically safe technology is available provided its application and use are properly regulated and controlled, there appears to be no advantage in the postponement of the proposed sale for this specific reason.

As new technology relating to safety and environmental protection is developed, it can be incorporated with .the existing requirements and applied to all OCS leases so that bringing on additional production now will not generally preclude adaptation of new advances to the prospective leases.

Delay of the proposed sale could result in retarded development of energy resources.

MacKINNON, Circuit Judge (concurring in part and dissenting in part):

The District Court enjoined the sale of oil leases involving in excess of $500 million based upon an alleged failure of the Government to discuss certain alternatives in its Final Environmental Impact Statement (hereafter the Impact Statement). The critical language in the court's finding in this respect reads as follows:

The Court finds that the defendants failed to comply with NEPA by failing to discuss some alternatives at all, such as meeting energy demands by federal legislation or administrative action freeing current onshore and state-controlled offshore production from state market demand prorationing or a change in the Federal Power Commission's natural gas pricing policies. In addition the defendants only superficially discussed the alternatives listed in their Final Impact Statement, and they failed to discuss in detail the environmental impacts of the alternatives they listed in the statement. The Court . . . believes that these alternatives must

be explored and discussed thoroughly in order to comport with the intent and requirements of Section 4332(2)(C) of NEPA.

\*　\*　\*　\*　\*　\*

[T]he Court suggests that the defendants reassess their position as to alternative sources of energy other than the lease sale of the tracts on the Outer Continental Shelf and the environmental impact of such alternatives.

When this general language is translated to the facts of this case it requires the Impact Statement to discuss the environmental impact of: (1) meeting energy demands by federal legislation or administrative action freeing current domestic production from state restrictions on production; (2) changing the Federal Power Commission's policy with respect to the pricing of natural gas; (3) elimination of import quotas; (4) increasing onshore exploration and development; (5) development of oil shale; (6) increasing nuclear energy development; (7) increasing use of low sulfur coal and/or desulfurization of coal; (8) development of coal liquefaction and gasification; (9) development of geothermal resources, and (10) development of tar sands.

As I interpret the majority opinion it clearly holds that there is no need to discuss (5), (7), (8), (9), or (10). Obviously these are not reasonably to be considered as present alternatives. I concur in such conclusions. Whether the majority opinion requires a discussion in the Impact Statement of (1), (2) and (6) is not clear in view of its statement that there is no need to discuss "remote and speculative possibilities in view of basic changes required in statutes and policies of other agencies." I assume however that the opinion intended to require these three to be covered and so I will discuss these later together with (3) and (4).

### (1) General Principles

It is my view that the range of alternatives that must be discussed in an Impact Statement is generally limited to realistic alternatives that will be reasonably available within the time the "decisionmaking"[1] official intends to act.

In this connection I would not normally consider alternatives to executive action under existing laws to be realistic if they would require substantial changes in existing laws or in long established patterns of production and consumption of industrial products that could not reasonably be expected to be changed within the time available. When the subject action is a legislative proposal addressed to Congress the Impact Statement must of course cover a wider range, i. e., it should cover alternatives that are reasonably available to Congress and would include legislative alternatives.

I thus take issue with that portion of the majority opinion that treats every Impact Statement as being addressed to Congress and the President and which would always require the discussion particularly of so-called legislative alternatives. A *copy* of the Impact Statement is made "available to the President," but that does not require *every* Impact Statement to discuss alternatives (and also their environmental impact) which might be alleged to be open to the President. In my view, the congressional committee report, quoted below, insofar as it refers to "subequent reviewers and decisionmakers" generally refers only to those officials who are within the "existing agency review process" and generally only requires the discussion of alternatives within the power of Congress or the President when Congress or the President may be the decisionmaker. (There may be some exceptions.) The committee report states:

> The agency shall develop information and provide descriptions of the *alternatives* in adequate detail *for subse-*

---

1. 42 U.S.C. § 4332(2) (A).

*quent reviewers and decisionmakers,* both within the executive branch and the Congress, to consider the alternatives along with the principal recommendations.

S.Rep.No.296, 91st Cong., 1st Sess. 21 (1969) (emphasis added). This ties into the provision of 42 U.S.C. § 4332 which provides that:

The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall— . . . (C) include in every recommendation or report on proposals for *legislation* and *other major Federal actions* significantly affecting the quality of the human environment, a detailed statement by the responsible official . . . . . (Emphasis added.)

The plain intent of Congress in the Committee Report, when read in conjunction with this statute, is to call for information concerning legislative alternatives to be addressed to Congress when the report contains "proposals for legislation" but not in all cases when the recommendation proposes "other major Federal actions" by the executive branch. While it could not be stated categorically that no action by an executive official would require the discussion of legislative alternatives, existing laws and reason dictate that it would not be required here or in all cases. As the congressional committee report indicates, *the Impact Statement is addressed primarily to the "subsequent reviewers and decisionmakers"* and this stops short of Congress and proposals for legislative changes in statutes where the decisionmaker is carrying out programs established by pre-existing laws enacted by Congress. It would be unreasonable to hold that Congress intended to require *every* Impact Statement under NEPA addressed to an *executive official* to discuss all possible *legislative* alternatives together with the possible environmental impact of all such alternatives. Such construction of the act would result in extending Impact Statements to limitless proportions. The act deserves

to be given a liberal interpretation to the fullest extent possible to accomplish a substantial change in our treatment of matters affecting our environment, but while no absolute rule can be laid down for all cases, I see no evidence in the statute that Congress intended to require a discussion of remote or speculative alternatives, or alternatives that were not presently available.

### (2) *Elimination of Import Quotas on Foreign Oil*

The conclusion that it is necessary to discuss the elimination of import quotas on foreign oil in the Impact Statement rests upon the claim that it is an alternative to the present sale of offshore leases. Technically such suggestion does seem to have some aspects of being a partial alternative but I do not consider that it is a realistic alternative. In the event that all import quotas were removed and all the oil production of our Outer Continental Shelf could be replaced by foreign oil, it is common knowledge that such course would not be adopted because the United States would then be wholly dependent upon foreign oil. We would be powerless as a nation to resist exorbitant prices for that oil, and we would be powerless to defend ourselves in a national emergency. It is thus essential to our national survival that we develop our own national production. It seems plain to me that that is precisely the policy that Congress declared on August 7, 1953 when it passed the act authorizing the Secretary of the Interior, as a matter of national policy, to lease the lands of the Outer Continental Shelf for oil exploration. At that time there were no restrictions on the importation of foreign oil so I fail to see how the return to conditions which existed at the time Congress originally passed the OCS (by the removal of the subsequently imposed import restrictions) would cause Congress to change its mind and terminate the development of our offshore oil. Under such circumstances the suggestion that import quotas be removed is not a realistic alternative. In passing the Outer Continental

Shelf Lands Act in 1953, Congress recognized the *"urgent need"* for developing our offshore oil.

> Sec. 8. *Leasing of outer Continental Shelf.*—(a) In order to meet the *urgent need for further exploration and development of the oil and gas deposits of the submerged lands of the outer Continental Shelf,* the Secretary is authorized to grant to the highest responsible qualified bidder by competitive bidding under regulations promulgated in advance, oil and gas leases on submerged lands of the outer Continental Shelf which are not covered by leases meeting the requirements of [subsection (a) of section 6] of this [Act.]

Outer Continental Shelf Lands Act of 1953, § 8, ch. 345, § 8, 67 Stat. 468, *codified at* 43 U.S.C. § 1337 (1970) (emphasis added).

The national needs behind this congressional declaration of policy were also referred to in the committee reports which accompanied the bill for the Outer Continental Shelf Lands Act. These stated that the development and operation of such lands through leases for oil and gas operations were vital to our national economy and security:

> Representatives of the Federal departments, the States, and the offshore operators all urged the importance and necessity for the enactment of legislation enabling the Federal Government to lease for oil and gas operations the vast areas of the Continental Shelf outside of State boundaries. They were unanimously of the opinion, in which this committee agrees, that no law now exists whereby the Federal Government can lease those submerged lands, *the development and operation of which are vital to our national economy and security.* It is, therefore, the duty of the Congress to enact promptly a leasing policy for the purpose of encouraging the discovery and development of the oil potential of the Continental Shelf.

H.R.Rep.No.413, 83d Cong., 1st Sess. 2–3, 153, 1953 U.S.Code Cong. & Admin. News, p. 2178 (emphasis added).

Congress has thus officially committed our government officials by statute to a policy of developing our offshore oil resources. The wisdom of that decision, having been made by Congress and being still in effect, in my opinion, need not be reargued every time some additional action is taken to carry out the declared policy of the statute. To my mind to so hold is an unreasonable interpretation of the statute. In reaching this conclusion I do not minimize the obligation of the Impact Statement to discuss to the fullest extent possible the environmental impact of the proposed action and all reasonable present alternatives to the immediate action being taken that materially affect the environment. But *the Impact Statement here has done that very thoroughly* and I consider that to be adequate compliance with the statute.

(3) *Meeting Energy Demands by Federal Legislation or Administrative Action Freeing Current Production from State Restrictions on Production*

Plaintiffs also contend that the Impact Statement should discuss the possibility of meeting energy demands by federal legislation or administrative action with respect to state restrictions on domestic production. Again it seems to me that this is not realistically a present alternative since the matter is for Congress and the President. Moreover, the overall considerations implicit in such alleged alternatives were considered and found wanting by the Congress when it made the findings and passed the legislation authorizing the Secretary of the Interior to lease the lands of the Outer Continental Shelf. Congress was certainly mindful of the domestic oil production situation at that time, as illustrated by their finding an urgent need for other oil and gas. Congress passed the Connally Hot Oil Act in 1935 (49 Stat. 30, et seq.) and since Congress

has left that act unamended and the President has not found that the statutory conditions exist for declaring its provisions inoperative,[2] the Act remains part of the general national policy that here exists.

I thus consider that the existence of the national policy declared in the Outer Continental Shelf Act, the silence of Congress in not repealing or amending the Connally Hot Oil Act, and the fact that the statutory standards of the Act do not authorize the President to lift the restrictions of the Connally Hot Oil Act for the purpose plaintiffs suggest, indicate that our national policy provides for the leasing, exploration and development of the offshore oil and gas lands and that as long as the Secretary of the Interior is carrying out such policy, the possibility that Congress might change this national policy is not an alternative that must be discussed in the Impact Statement here involved.

### (4) *The President's Message*

We next come to the President's June 4, 1971 Energy Message to Congress which comprehensively discussed the energy needs of the Nation. The full statement appears in 117 Congressional Record H 4715–19 (daily ed., June 4, 1971). This message contained six sentences relating to offshore oil and gas leases:

### LEASING ON THE OUTER CONTINENTAL SHELF—AN ACCELERATED PROGRAM

The Outer Continental Shelf has proved to be a prolific source of oil and gas, but it has also been the source of troublesome oil spills in recent years. Our ability to tap the great potential of offshore areas has been seriously hampered by these environmental problems.

The Department of the Interior has significantly strengthened the environmental protection requirements controlling offshore drilling and we will continue to enforce these requirements very strictly. As a prerequisite to Federal lease sales, environmental assessments will be made in accordance with section 102 of the National Environmental Policy Act of 1969.

Within these clear limits, we will accelerate our efforts to utilize this rich source of fuel. In order to expand productive possibilities as rapidly as possible, the accelerated program should include the sale of new leases not only in the highly productive Gulf of Mexico, but also some other promising areas. I am therefore directing the Secretary of the Interior to increase the offerings of oil and gas leases and to publish a schedule for lease offerings on the Outer Continental Shelf during the next five years, beginning with a general lease sale and a drainage sale this year.

*Id.* at H 4717.

The foregoing statements are seized upon by the majority opinion as announcing some new program, but in my view that is not supported. All that the President has done here is provide for a mild acceleration in an existing program that was first authorized twenty years ago. He has not changed any leasing procedures and, insofar as oil and gas lands in the Gulf of Mexico are concerned he has not added any new areas to the scheduled leasing program. He has merely accelerated by less than three months [3] the leasing of lands already scheduled to be leased. *This minimal acceleration does not involve any impact on the environment that would not have*

2. 15 U.S.C. § 715c (49 Stat. 31).

3. The Secretary of the Interior's announcement of the sale in the Federal Register reported:
 This sale was originally planned for February 1972 and has been advanced to December 1971, in accordance with the President's June 4, 1971, energy message to Congress.
 36 Fed.Reg. 11604 (June 16, 1971).

*been caused by existing policy when the same lands were leased for the same purpose a few months hence on the normal schedule.* (In fact the delay caused by this lawsuit has practically eliminated any effect whatsoever.)

There is nothing in NEPA to indicate that Congress intended to require Impact Statements for the continuation of existing laws and programs. The statute merely required a policy review of "present statutory authority" to be made and reported to the President by July 1, 1971.[4] Such review does not require Impact Statements.

I thus find nothing in the President's message, or in the acts of the Secretary of the Interior which followed said message, that imposes any threat to the environment that was not already present in existing programs being carried on pursuant to previously existing laws which were required to be fully reviewed prior to July 1, 1971. When the majority here require the subject Impact Statement to discuss alternatives to existing laws *which it is not proposed to change,* and also to discuss the environmental impact of such indefinite alternatives, I consider that the opinion is not soundly based in law.

I also find nothing in the Act to support the assertion of the majority opinion that because the President did not issue an Impact Statement in connection with his Energy Message to Congress that a duty to do so fell upon the Secretary of the Interior when he acted to carry out a minor part of the program. By such holding the majority opinion would require the Secretary of the Interior to support the entire Energy Message in an Impact Statement which is only required because he is implementing a microscopic portion of it. To merely state this result is sufficient to indicate its unsoundness. If such were the law subordinate officials would be required to promulgate Impact Statements far beyond the relevant act of decisionmaking. While the relevant authority of the decisionmaker may not constitute an absolute limit on the scope of subjects required to be covered by an Impact Statement, his decisionmaking authority with respect to the proposed action is certainly the most important consideration in determining the limits of that document and constitutes the principal frame of reference to which the statement should be addressed.

(5) *Nuclear Energy, Increasing Onshore Exploration and FPC Pricing Policy on Natural Gas*

As to nuclear energy, increasing onshore exploration and changing the pric-

---

4. 42 U.S.C. § 4333 provides:

 All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter.
 National Environmental Policy Act of 1969, § 103, Pub.L. No. 91-190, 83 Stat. 854.

 Insofar as the majority opinion requires Impact Statements under NEPA to cover alternatives to the 1953 Outer Continental Shelf Lands Act and the Oil Import Quota Program of 1959, it overlooks the fact that NEPA required such existing programs to be reviewed and proposals reported to the President for such measures as may be necessary to bring their policies into conformity with the intent of NEPA. The fact that Congress dealt with existing programs in this manner in NEPA is a clear indication that it did not intend in NEPA to require Impact Statements to cover the same ground.

ing policy on natural gas by the Federal Power Commission, these all involve actions by other agencies and individuals not realistically within the scope of the decisionmaking authority here involved. Many of the principals involved are not controlled by the United States Government. Whether any of these proposals individually or collectively would constitute a partial or adequate present alternative to the action here proposed is highly problematical. Actually all ~of them are being pursued to some extent. They also have their own environmental problems.

Certainly we consider we are proceeding with research and development of nuclear energy with all deliberate speed. The present state of our research and development is on the borderline of producing equipment that has practical value for commercial uses. *See* Cities of Statesville, et al. v. Atomic Energy Commission, 142 U.S.App.D.C. 272, 441 F.2d 962 (*en banc*, 1969). But atomic energy is not a present alternative to the oil needed to supply our internal combustion engines and meet our other fuel demands.

Certainly if any person knew where to explore for more onshore oil or gas in substantial quantities in the United States, he would not want for support. Moreover, the Impact Statement did discuss this suggestion and pointed out that it had been weighed and found to be inadequate:

Until recently, the petroleum industry has been able to satisfy domestic demand for oil and gas from the onshore areas. With the exception of Alaska, however, current seismic exploration techniques have not been able to identify sufficient numbers of new prospective oil and gas bearing geologic structures onshore that are suitable for further exploration or development investments. This has been reflected by a significant decline in both onshore drilling and proved reserves.

In contrast, however, the geologic structures in the relatively unexplored or virgin areas are more easily identifiable using current seismic technology.

*Final Environmental Impact Statement* 52–53. I see no reasonable necessity to discuss the environmental impact of a suggested alternative that has been rejected because it is not a practical alternative.

The majority opinion is not specific as to whether in its treatment of increasing onshore exploration and development it requires the Impact Statement to discuss the alternative of substituting oil from the North Slope of Alaska for this Gulf oil and to discuss the environmental impact of that alleged alternative. If such discussion is so required, I would take judicial notice of those facts of common knowledge that the production and transportation facilities necessary for North Slope oil to constitute a realistic present alternative to this proposal are presently non-existent. The North Slope field also has its own well known environmental problems. To the extent that plaintiffs or the majority opinion may contend that this Impact Statement needs to discuss the effect on the environment of the North Slope alternative it is to my mind, presently an unreasonable suggestion.

Notice is also taken of our own decision upholding the Federal Power Commission in altering its pricing policies on natural gas to stimulate the domestic production of natural gas. City of Chicago v. Federal Power Commission, 147 U.S.App.D.C. ——, p. ——, 458 F.2d 731, p. 738 (1971).

So, much of what is suggested by these so-called alternatives is already being done and is a matter of common knowledge. Some of the suggested alternatives would require immediate changes in existing federal laws and decisions of independent federal agencies; some are impractical because they would require

officials to act in a manner they have indicated is contrary to their declared intent; some suggest alternatives involving uncertain results, highly speculative probabilities or experimental uncertainties; some suggest as alternatives proposals that would not satisfy the same need; some would only be partial alternatives; and some involve ideas that are years away, if ever, from fruition. *None can be said to be realistic present alternatives.* Because of these circumstances, and others referred to in the Impact Statement, I do not find any of the suggestions to be alternatives within the meaning of the Act. I would thus not enjoin the sale here to require their discussion in the Impact Statement. To do so would make delay the only victor.

I am not unmindful of the ease with which some of the required additional discussion can be inserted in the Impact Statement. I just do not consider that the law requires, or that reason dictates, the discussion of unrealistic alternatives or their environmental impact. In so requiring it is my view that the majority opinion extends the law to extreme and impractical ends. I would confine the interpretation of NEPA to call for full discussion of reasonably practical present alternatives rather than lay down requirements for the exposition of every hopeful project and legislative change that may be said to be even remotely related to the subject. To my mind, the former rule would better serve the environment. To this extent I dissent from the views of the majority opinion.

In my opinion the motion for summary reversal should be granted upon the ground that the decision of the trial court was based upon an erroneous legal premise, i. e., that NEPA required the Impact Statement to discuss alternatives that were highly speculative and remote and which are not realistic present alternatives.