**TOWN OF MATTHEWS, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF TRANSPORTATION and William T. Coleman, Secretary thereof; North Carolina Department of Transportation and G. Perry Greene, Secretary thereof, Defendants.**

**No. C–C–76–211.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Dec. 14, 1981.

Hugh G. Casey, Jr. and George Daly, Charlotte, N. C., for plaintiff.

James D. Billett, Regional Counsel, U. S. Dept. of Transportation, Atlanta, Ga., and James B. Richmond, N. C. Dept. of Justice, Raleigh, N. C., for defendants.

## SUPPLEMENTAL MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

This civil action was filed on July 20, 1976, seeking to enjoin defendants' proposed reconstruction and partial widening of existing North Carolina Highway 51 from North Carolina Highway 16 (Providence Road) through Matthews, North Carolina, and out to U. S. Highway 74 (Independence Boulevard), all in Mecklenburg County, North Carolina. The claim is based on defendants' alleged failure to comply with the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), and on other claims, and more particularly based on defendants' alleged failure to comply with § 4332(2)(C)(iii) and (E) of NEPA, by failing to give adequate consideration to any alternative that would route through traffic around the Town of Matthews.

On March 29, 1977, defendants were preliminarily enjoined from carrying out the proposed project, pending preparation of an Environmental Impact Statement ("EIS") and further orders of the court. The defendants filed a final EIS on November 7, 1980. A hearing on its sufficiency was conducted on October 19, 1981.

The defendants propose to make North Carolina Highway 51 a straighter, wider two-lane road from North Carolina Highway 16 to the westerly city limits of Matthews, and convert the existing road (which is already four-lane through a part of Matthews) into a four-lane road all the way to U. S. 74. The route will include two existing 90-degree turns in Matthews. The court has previously ruled that the project is a major federal action significantly affecting the human environment.

Matthews has a present population of approximately 3,100 persons. Ten years ago it was a rural village. In the last decade it has been transformed into a suburb of Charlotte. Present traffic volume on N. C. 51 through Matthews is estimated by defendants at 11,600 vehicles per day, and is projected to reach up to 19,000 per day by 1995, even assuming the "outer loop" proposed freeway (south of Matthews) is completed. The Town of Matthews has repeatedly requested that defendants include a bypass around Matthews in the project, and the City of Charlotte and the Centralina Council of Governments supported the town in opposing construction of the project unless it included a bypass.

The defendants failed to give adequate consideration to the bypass alternative in the EIS. The entire discussion of the bypass alternative was as follows:

"A major relocation of NC 51 was also a possible alternative. The Charlotte-

Mecklenburg Thoroughfare Plan includes a major freeway facility in the general traffic corridor served by NC 51. This facility, which is planned to generally parallel NC 51 to the south, is referred to as the 'outer loop' and is included in the 1971–1985 Highway Improvement Program. Right-of-way acquisition is scheduled to begin in fiscal 1983 for this facility. The 'outer loop' is not an alternative to the proposed improvements to NC 51 since these improvements are needed in addition to the 'outer loop.' The proposed improvements to NC 51 are based upon the assumption that the 'outer loop' will be constructed. Studies [footnote omitted] of the 'outer loop' have concluded that existing NC 51 cannot feasibly be improved to adequately serve the traffic projected for the 'outer loop.' The 'outer loop' would also provide a bypass in Matthews that would serve major traffic in the area. At the request of the Town of Matthews, several relocations or 'local' bypasses of Matthews were studied in the early planning stages for this project. The advantages of these bypasses would be to remove local bypassable traffic from the main business district and also eliminate this traffic from having to negotiate two 90-degree turns. This local bypassable traffic is estimated to range from approximately 3,000 vpd [vehicles per day] in 1980 to 6,000 vpd in 1995. The location designated as No. 5 in Figure 5 was requested by the town to serve industrial development. This location is included in the thoroughfare plan. The reason that one of the 'local' bypasses of Matthews was not recommended in the Final Negative Declaration was that 1) improvements to NC 51 to correct existing substandard features are needed with or without the bypass, 2) the through traffic can best be served by constructing the 'outer loop,' 3) the proposed improvements to existing NC 51 would not preclude the future development of the bypass, 4) assuming completion of the 'outer loop,' existing NC 51 with the recommended improvements within Matthews will provide acceptable traffic service through the planning period, 1995, and *providing a bypass was beyond the scope of the NC 51 project as included in the Highway Improvement Program."* (Emphasis added.)

After publication of the EIS, the Town of Matthews inquired of the defendants, "[w]hy has there been no comparison, on environmental grounds, between the recommended project and the project with the bypass?" The defendants responded that "[t]he bypass has been considered to be beyond the scope of the NC 51 improvement project. There is no need to get into a detailed environmental comparison of a new location which is not within the scope of the project."

Thus, the defendants assume that the sole purpose or goal of the Highway 51 improvement project is the repair of an existing substandard road, and they assert that the only alternative methods of *repair* of that road are "within the scope" of the project, and need be considered in the EIS. After reviewing the documents in the record describing the project from its inception, and considering the parties' briefs, testimony, and oral arguments, the court finds that the proposed project has the *dual* purposes of repairing an old road, *and* of upgrading it, to serve the through traffic from U. S. Highway 74 to N. C. Highway 16 in the foreseeable future.

■ NEPA does not require that an Environmental Impact Statement evaluate any *particular* alternative to a proposed action. At the same time, however, it does not permit the agency to eliminate from discussion or consideration a whole range of alternatives, merely because they would achieve only *some* of the purposes of a multi-purpose project. *See e.g., Natural Resources Defense Council v. Morton*, 458 F.2d 827, 836 (D.C.Cir., 1972) ("[it is not] appropriate, as Government counsel argues, to disregard alternatives merely because they do not offer a complete solution to the problem."); *Rankin v. Coleman*, 394 F.Supp. 647, 659 (E.D.N.C., 1975) ("a rigorous exploration and objective evaluation of alternative actions that might avoid some

or all of the adverse environmental effects is essential .... The extremes *between which discussable alternatives fall* are the alternatives of no action and of an action that fully accomplishes the original goal but without any of its objectionable features." [emphasis added] ).

▪ Obviously, any genuine *alternative* to a proposed action will not fully accomplish all of the goals of the original proposal. One of the reasons that Congress has required agencies to set out and evaluate alternative actions is to give perspective on the environmental costs, and the social necessity, of going ahead with the original proposal. *See Natural Resources Defense Council v. Morton*, 458 F.2d at 833–34 and n. 12. In this case, the EIS that defendants have prepared does not include sufficient study of bypass alternatives to determine whether the proposed improvements of the existing road would even be necessary, if that road were not expected to serve heavy highway traffic. The court finds this EIS to be inadequate, and determines that the agency must consider reasonable alternatives to its plan to "improve" the town's streets into a corridor suitable for heavy highway traffic.

While claiming that bypass alternatives are "outside the scope of the project," defendants also argue, in the alternative, that they have already adequately considered a local bypass. The court has studied the discussions to which they refer, in the Final Negative Declaration and the EIS, and finds that they are entirely lacking in factual foundation and reasoned analysis. The conclusions reached in those discussions thus appear to the court to be arbitrary and capricious, and not to meet the minimal standards imposed by § 4332(2)(C)(iii) and (E).

The first claim advanced by defendants against the bypass is that "improvements to N. C. 51 to correct existing substandard features are needed with or without the bypass." This assertion is nowhere demonstrated, however, since the EIS contains no analysis of projected traffic volumes on existing N. C. 51 through Matthews, if a local bypass were built.

The second claim advanced by defendants against the bypass is that "the through traffic can best be served by constructing the 'outer loop.'" This is an *ipse dixit* unsupported by fact or analysis. The "outer loop" has been talked about for decades but has not yet been built and no funds have been appropriated for its construction. Its corridor has only recently been decided. Thus, Highway 51 is destined for the foreseeable future to be the route of choice for trucks and other vehicles wanting to bypass Charlotte to the south. It is settled that "remote and speculative possibilities" have no place in an analysis of alternatives under § 4332(2)(C)(iii) or (E). *See, e.g., Natural Resources Defense Council v. Morton*, 485 F.2d at 837–38.

The third claim advanced by defendants against the bypass is that "the improvements to existing N. C. 51 would not preclude the future development of a bypass." This suggestion that a bypass may be built sometime in the future is no substitute for an analysis of its environmental effects; it provides no help to the agency in evaluating the environmental impact of the proposed action.

The court determines that this purported analysis of a bypass alternative is arbitrary and capricious, in that it consists entirely of foregone conclusions, rather than facts. It fails to fulfill the minimal requirements of § 4332(2)(C)(iii) and (E) of NEPA. *See, e.g., Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Conservation Council of North Carolina v. Froehlke*, 473 F.2d 664 (4th Cir., 1973); *Coalition for Responsible Regional Development v. Coleman*, 555 F.2d 398 (4th Cir., 1977); *Natural Resources Defense Council v. Morton*, 458 F.2d 827 (D.C.Cir., 1972).

There is no further need to enjoin work on the portion of N. C. 51 which can be straightened and improved without foreclosing full consideration of bypass alternatives.

All claims not addressed in this order are deferred for later action.

IT IS THEREFORE ORDERED that defendants be ENJOINED AND RESTRAINED from any further construction

or alteration of N. C. 51 (including acquisition of right-of-way but excluding repair of potholes and the like) from the westerly city limit of Matthews, North Carolina, to the intersection of N. C. 51 with U. S. Highway 74, and from commencing any construction which would tend to prevent the later construction of a bypass (via either a northerly or a southerly route) of Highway 51 around Matthews, pending further orders of the court.

Defendants may apply for modification or cessation of this restraint after presentation of a study, conformable to the law and regulations, of the alternative of a Matthews bypass. Any such study should include, at a minimum, consideration of the real world timetable for completion of the outer loop; the consequentially expected relief of N. C. 51 traffic that will be thereby accomplished; the environmental cost of increased traffic through Matthews, if neither the bypass nor the outer loop are constructed; an attempted quantification of the cost of the bypass as against the value of the increased peace and quiet in Matthews; consideration of the views of governmental bodies favoring construction of the bypass; and perhaps even another town meeting with the citizens of Matthews, since it is they who live in the "human environment" protected by the National Environmental Policy Act.