CITY OF RIDGELAND and Friends of Old Agency Road Plaintiffs

v.

THE NATIONAL PARK SERVICE; Fran P. Mainella, in Her Capacity as Executive Director of the National Park Service; and Wendell A. Simpson, in His Official Capacity as Superintendent of the Natchez Trace Parkway Defendants

No. CIV.A. 3:01CV917LN.

United States District Court, S.D. Mississippi, Jackson Division.

July 2, 2002.

---

Jerry L. Mills, Pyle, Dreher, Mills & Dye, PA, Ridgeland, MS, Allan P. Bennett, Laura Limerick Gibbes, Watkins, Ludlam, Winter & Stennis, P.A., Jackson, MS, for Plaintiff or Petitioner.

Robert G. Anderson, U.S. Attorney's Office, Civil Division, Jackson, MS, for Defendant or Respondent.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, Chief Judge.

Plaintiffs City of Ridgeland and Friends of Old Agency Road have moved for a preliminary injunction, pending final disposition of this case on the merits, to prevent the National Park Service (NPS) from implementing a proposed plan for the completion of a section of the Natchez Trace Parkway within the City of Ridgeland which, *inter alia,* provides for the closure of a portion of Old Agency Road. At the request of defendant the National Park Service (NPS), an evidentiary hearing on the motion was scheduled and conducted by the court on May 23 and 24, 2002, and the court, having considered the parties' arguments and the evidence adduced at the hearing and otherwise, concludes that plaintiffs' motion is due to be denied.

*Background*

The Natchez Trace Parkway was established in 1938 as a rural scenic parkway to commemorate the Old Natchez Trace, a primitive network of trails that stretched from Natchez, Mississippi to Nashville, Tennessee. The parkway, which is administered by the National Park Service, roughly follows the original route of the original Natchez Trace and has been under a process of near continuous construction for more than sixty years. Of the total anticipated 444-mile parkway, there remain only two short segments to be completed, totaling only around twenty miles—one near Natchez, and the other between Interstate 20 in Clinton, Mississippi to near Interstate 55 in Ridgeland. A 1.1 mile section of this latter segment is the subject of this lawsuit.

In 1967, the NPS acquired a strip of land in the City of Ridgeland, approximately 800-feet wide and just over a mile in length, for the purpose of constructing this section of the parkway. Running east to west through that strip of what was then rural, undeveloped land was an old gravel road, Old Agency Road. In 1978, after acquiring the land, the NPS completed an Environmental Impact Statement for this section of the parkway, as required by the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* After considering a number of alternatives for the project, the NPS settled on an alternative for completing the parkway that provided for closing a short portion of Old Agency Road and having the parkway cross Old Agency Road via a bridge over the closed section.

Old Agency Road as it runs through and to the west of Ridgeland follows the route of the original Natchez Trace, and though it was eventually paved with asphalt and is wider than the historic Natchez Trace, it is, in the words of the NPS, "evocative in its surrounding landscape of the narrow road or trail that linked Nashville and Natchez 190 years ago."

It is narrow with a width of 30-feet and winds through an area of low undulating hills interspersed with small stream bottom lands with high earthen banks on each side. In many areas large trees border the road and overhang it creating a canopy effect. In other areas it passes through fields and pastures.... The road also retains the appearance of

the rural county roads that were once typical of Mississippi, but now are rapidly disappearing.[1]

In recognition of the fact that the project as proposed would adversely affect this historic resource, the NPS, prior to moving forward with construction, began a process of consultation with the Mississippi Department of Archives and History, as required by the National Historic Preservation Act, 16 U.S.C. § 470, to consider feasible and prudent alternatives to avoid or satisfactorily mitigate the adverse effect. However, the NPS and the Mississippi Department of Archives and History (MDAH) had different opinions as to the exact period of the road's historical significance and how to best protect and preserve the resource; and ultimately, after a number of years of unsuccessful efforts to reach agreement on how the project should proceed, the MDAH withdrew from consultation with the NPS in April 1994. Consequently, as provided by the NHPA, the NPS commenced consultation with the Advisory Council on Historic Preservation.

By this time, the area in question was no longer rural and undeveloped but rather, a school (St. Andrews Episcopal School) had been built and a number of residential developments had sprung up along Old Agency Road (namely Dinsmor, Canterbury and Windrush), as a result of which there was naturally heightened public interest in the proposed project. In light of these circumstances, in 1998, the NPS undertook to prepare a Supplemental Environmental Impact Statement for the project. In connection with that process, the NPS held a number of meetings to permit public input as to how the NPS should proceed with development of the parkway through the Old Agency Road area. A meeting was held with homeowners in the area; another was held with staff of St. Andrews School; a public open-house-type meeting was held in Ridgeland in August 1998; and a second public meeting was held on November 5, 1998.

In early 2001, NPS issued a Draft Supplemental Environmental Impact Statement, setting forth its proposed plan to complete the project; a notice of availability was published in the Federal Register on February 16, 2001, and copies were delivered to various interested individuals, organizations and government agencies. Subsequently, a Revised Proposed Action (revised for the stated purpose of improving east-west and north-south access, traffic circulation and providing capacity for increased local traffic)[2] was developed, and a Final Supplemental Environmental Impact Statement (FSEIS) was published in the Federal Register. According to the NPS, after analyzing each of six comments received during the ensuing 30–day no action period,[3] it concluded that none raised new issues that required an additional response or required modification of the plan. The NPS thus proposes to construct this segment of the Natchez Trace Park-

1. This description of the road appears in the NPS's 1994 nomination of this section of the Old Natchez Trace for inclusion in the National Register of Historic Places.

2. According to the NPS, the plan was revised to move the bridge crossing the parkway in the Highland Colony Parkway–to–Richardson Road section further east in response to, *inter alia,* concerns voiced by homeowners that the close proximity of the proposed bridge to their homes compromised their privacy.

3. Under NEPA, once a draft Environmental Impact Statement is prepared, Council on Environmental Quality (CEQ) guidelines provide that "(t)o the maximum extent practicable" no action should be taken sooner than 90 days after a draft environmental impact statement (and 30 days after the final statement) has been made available for comment. 40 C.F.R. § 1506.10(b).

way according to the Revised Proposed Action set forth in the FSEIS.

### The Revised Proposed Action:

The project area is an approximately 800–feet–wide corridor that extends from Highland Colony Parkway to just east of Whippoorwill Lane. The NPS's proposal for completion of the parkway in this area contemplates that (a) Old Agency Road will be closed from Richardson Road to Whippoorwill Road; (b) the Natchez Trace Parkway motor road will cross the closed section of Old Agency Road approximately at grade; (c) a new road, Old Agency Relocated, will be constructed to relocate traffic from the closed portion of Old Agency Road, and (d) a new road, bridged over the parkway motor road, will be constructed to connect Old Agency Relocated to the remaining portion of Old Agency Road, beginning approximately across from the St. Andrew's School ballfield parking lot. NPS proposes to remove the pavement from that segment of Old Agency Road closed as a result of the parkway construction and to restore the appearance of the Old Natchez Trace to the period of what NPS maintains is its primary historical significance, namely, its use as a footpath in the 1700s and early 1800s.

### Plaintiffs' Motion for Preliminary Injunction:

Plaintiffs filed this suit alleging that in adopting its proposal for this project, the NPS has failed to comply with its mandate under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* and the National Historic Preservation Act (NHPA), 16 U.S.C. § 470, and has failed to satisfy the requirements of due process. As relief, plaintiffs seek to enjoin the NPS from proceeding with is proposed plan for construction until it shall first have complied in good faith with its obligations under these federal statutes. More immediately, they have moved for a preliminary injunction, asking that the NPS be enjoined from implementing its proposal for completing this section of the parkway pending final disposition of this case on the merits.

To prevail on their motion for preliminary injunction, plaintiffs must establish that (1) there is a substantial likelihood that they will prevail on the merits, (2) there is a substantial threat that they will suffer irreparable injury if the preliminary injunction is denied, (3) the threatened injury to the plaintiffs outweighs the threatened injury to the party to be enjoined, and (4) granting the preliminary injunction will not disserve the public interest. *See Sierra Club v. FDIC,* 992 F.2d 545, 551 (5th Cir.1993). To obtain preliminary injunctive relief, plaintiffs must successfully carry the burden of persuasion as to each element of this four-pronged test— which is to say, a preliminary injunction will be denied based on a failure to prove separately each of these four elements for obtaining an injunction. *See Plains Cotton Co-op. Ass'n of Lubbock, Tex. v. Goodpasture Computer Serv., Inc.,* 807 F.2d 1256, 1261 (5th Cir.1987) (reiterating circuit's position that "preliminary injunctions will be denied based on a failure to prove separately each of the four elements of the four prong test for obtaining the injunction") (citing *Apple Barrel Prods., Inc. v. Beard,* 730 F.2d 384, 386 (5th Cir.1984), and *Southern Monorail Co. v. Robbins & Myers, Inc.,* 666 F.2d 185, 186 (5th Cir. 1982)).

Here, although the court considers that plaintiffs' positions with respect to elements (2), (3) and (4) above have arguable merit, the court need not definitively resolve whether they have in fact sustained their burden on these elements, for in the court's opinion, plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims.

*Preface:*

Before addressing the parties' positions, the court would make these points clear. First, no party or person involved in or associated in any way with this litigation takes the position that the Natchez Trace Parkway ought not be completed. On the contrary, there is nearly universal support for completing the parkway project, and among those here involved, the support is unanimous.[4] The parties also plainly recognize that if the Natchez Trace Parkway is to be completed—and it is—then because of the location of Old Agency Road with the boundaries of the NPS's right-of-way, it is inevitable that the parkway motor road will cross the existing Old Agency Road.[5] And broadly speaking, there are but three alternatives for such a crossing: the parkway road must either go over Old Agency Road, under Old Agency Road or cross Old Agency Road at grade. The issue that has divided the parties is which of these is the better alternative. For their part, plaintiffs are adamant that Old Agency Road should remain open in its entirety, and they maintain that the best configuration for all purposes is one that accomplishes this result. The NPS has concluded otherwise.

*The National Environmental Policy Act:*

The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*, is a procedural statute which demands that decisions by federal agencies to go forward with projects that significantly affect the environment be "environmentally con-

scious." *Sabine River Auth. v. U.S. Dept. of Interior,* 951 F.2d 669, 675 (5th Cir. 1992); *see also Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (per curiam). To that end, section 102(C) of NEPA, 42 U.S.C. § 4332(C), requires that federal agencies proposing "major Federal actions significantly affecting the quality of the human environment" prepare a "detailed statement" on the environmental impact of the proposed action prior to implementation of the proposal, *Sierra Club v. Sigler,* 695 F.2d 957, 964–65 (5th Cir.1983). The purpose of this requirement "is to make an agency consider the environmental effects of its actions; the impact statement requires the agency fully to disclose that evaluation, thus proving the evaluation has been made and warning interested parties of the probable environmental effects." *State of La. v. Federal Power Comm'n,* 503 F.2d 844, 875–76 (5th Cir. 1974); *see also Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348, 109 S.Ct. 1835, 1844, 104 L.Ed.2d 351 (1989) (describing NEPA as "action-forcing"); *Sabine,* 951 F.2d at 675 (NEPA "does not command the agency to favor an environmentally preferable course of action, only that it make its decision to proceed with the action after taking a 'hard look at environmental consequences'") (quoting *Robertson,* 490 U.S. at 349, 109 S.Ct. at 1846); *Sigler,* 695 F.2d at 965 (the policy of NEPA is "to ensure that those agencies consider the environmental effects of their

---

4. For example, in his testimony at the preliminary injunction hearing, Mayor McGee stressed that the City has never taken the position that the NPS ought not build the Natchez Trace Parkway; rather, the City, he said, has been and is "very supportive of completing" the Natchez Trace Parkway.

5. As explained in the Waggoner Report prepared at the request of the City of Ridgeland,

given the location of Old Agency Road within the boundaries of the NPS's right-of-way, lying from a point adjacent to the north right-of-way line near Richardson Road to the south right-of-way line near the west boundary of Dinsmor subdivision, "it is obvious that a crossing between the Natchez Trace Parkway and Old Agency Road must occur within this roadway segment."

actions during their decisionmaking process.").

■ While NEPA is designed to ensure that agency decisions be "environmentally conscious" by requiring "that the agency gather, study, and disseminate information concerning the projects' environmental consequences," *Sabine*, 951 F.2d at 676, the Act contains no substantive directives for agency decisions. That is, it is strictly a procedural statute, "mandating only that [federal agencies] follow a particular process—the compilation of Environmental Impact Statements ("EIS")." *Sierra Club v. Peterson*, 185 F.3d 349, 373 n. 34 (5th Cir.1999). Hence, a court called on to review the adequacy of an EIS under NEPA is "not to concern [itself] with the merits of the agency's decision;" its "concern instead is with the integrity of NEPA–EIS process used to make that decision." *Sigler*, 695 F.2d at 965. In other words, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." [6] *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983); *see also Strycker's Bay Neighborhood Council*, 444 U.S. at 227, 100 S.Ct. at 500 (per curiam) ("[O]nce an agency has made a decision subject to NEPA'S procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences.").

"To make this finding the court must consider whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

*Sigler*, 695 F.2d at 964 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)); *see also Sabine*, 951 F.2d at 676 (stating that " '[o]ther statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action' ") (quoting *Robertson*, 490 U.S. at 350, 109 S.Ct. at 1846).

■ In assessing the adequacy of an EIS prepared pursuant to NEPA, the court considers three criteria:

(1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives; (2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and (3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different courses of action.

*Sigler*, 695 F.2d at 965 (citing *Isle of Hope Historical Ass'n, Inc. v. United States Army Corps of Eng'rs*, 646 F.2d 215, 220 (5th Cir.1981) (per curiam)); *see also Mississippi River Basin Alliance v. Joseph W. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000) (same). The court considers these issues, bearing in mind that the agency's compliance with NEPA's procedural requirements is evaluated under a "rule of

---

**6.** Courts have held that since NEPA contains no separate provision for judicial review, then judicial review of agency action is governed by the Administrative Procedures Act (APA), 5 U.S.C. § 706, which provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Save Our Comm. v. U.S. E.P.A.*, 971 F.2d 1155, 1161 (5th Cir.1992).

reason," pursuant to which " 'an EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible.' " *New York Natural Res. Def. Council, Inc. v. Kleppe,* 429 U.S. 1307, 1311, 97 S.Ct. 4, 6, 50 L.Ed.2d 38 (1976) (quoting *Natural Res. Def. Council v. Callaway,* 524 F.2d 79, 88 (2d Cir.1975)); *see also Sierra Club v. Froehlke,* 816 F.2d 205, 213 (5th Cir.1987) (stating, "Our review of an agency's compliance with NEPA is guided by a 'rule of reason,' and we will not 'fly speck' an EIS"); *Isle of Hope Historical Ass'n,* 646 F.2d at 220 (explaining that "[t]he role of [the court] in reviewing a disputed EIS is strictly limited"); *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 436 (5th Cir.1981) (recognizing that "an EIS cannot be held to a standard of perfection," and that "[a]lthough the procedural requirements of NEPA must be satisfied, the courts will require only the 'statutory minima,' refusing to substitute their judgment for the judgment of the administrative agencies charged with satisfying the requirements of NEPA.").

### Plaintiffs' NEPA Allegations:

Generally, plaintiffs allege that NPS failed to take the requisite "hard look" at the environmental consequences of its proposed plan for construction of the disputed segment of the Natchez Trace Parkway sufficient to meet the standards set forth in NEPA and that it failed to consider and/or implement mitigation measures sufficient to reduce and/or compensate for the environmental harm arising from the proposed plan. Their principal objections to the FSEIS may be fairly summarized to claim:

1. The FSEIS does not consider a reasonable and proper range of alternatives.

2. The FSEIS fails to properly consider wetlands mitigation impacts.

3. The FSEIS reflects a failure by the NPS to properly consider current and future transportation and traffic information.

The court will address these claims seriatim.[7]

### 1. Alternatives Analysis

■ As a means of assuring that a federal agency "as a decision-making body has considered methods of achieving [a] desired goal other than the proposed action," *Piedmont Heights,* 637 F.2d at 435–36, NEPA requires that in assessing the environmental effects of a project, the federal agency discuss reasonable alternatives to the proposed action, *id.* (citing 42 U.S.C. § 4332(2)(C)(iii)); the theory being that "[c]onsideration of other realistic possibilities for action forces an agency to consider the environmental effects of a project and evaluate those effects against the effects of alternatives," *id.* at 436. The discussion of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14.[8]

---

7. It is apparent to the court that plaintiffs have not invoked NEPA out of concern for any potentially adverse environmental consequences of the NPS's proposed plan. Rather, for reasons unrelated to any environmental impact, they strongly oppose the proposed closure of Old Agency Road and are summoning their best efforts to prevent this occurrence. That this is so is evidenced by the fact that plaintiffs do not appear to contend that

their preferred alternative for completing the parkway poses any less adverse environmental consequences than that selected by the NPS. Regardless of plaintiffs' probable motivation for alleging these NEPA violations, however, their claims deserve the court's full attention.

8. The pertinent regulation by the Council on Environmental Quality states:

As the court comprehends their position, plaintiffs claim, in a nutshell, that the NPS has not "in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives," as is its mandate under NEPA, *Mississippi River Basin*, 230 F.3d at 174, but rather has attempted to pass off the FSEIS as evidence of a "decision-making" process when, in fact, its decision to close Old Agency Road was made before the FSEIS process even began. Were that the case, then relief would be proper. *See Kootenai Tribe of Idaho v. Veneman*, 142 F.Supp.2d 1231, 1246 (D.Idaho 2001) (stating that "neither the number of meetings nor the volume of comments are instructive by themselves if the evidence suggests that the decision making process was used to rationalize or justify decisions already made"); *see also Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir.2000) (recognizing that an agency's NEPA analysis "must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made"); *Town of Matthews v. United States Dept. of Transportation*, 527 F.Supp. 1055, 1058 (W.D.N.C. 1981) (holding that a purported analysis of alternatives that "consists entirely of foregone conclusions, rather than facts" fails to fulfill the minimal requirements of NEPA and is arbitrary and capricious).

█ In connection with their theory in this regard, plaintiffs argue that of the six alternatives included by the NPS in the FSEIS for detailed study, the NPS did not, in fact, give due consideration to Alternative 4, the only alternative that left Old Agency Road open. They claim, in fact, that not only did the NPS not give Alternative 4 serious consideration, but it actually fashioned Alternative 4 as a "poison pill" which it could reject without consequence. That the NPS's decision was predetermined, they submit, is evidenced by the further fact that the FSEIS contains no analysis, much less a detailed analysis, of Waggoner Alternative 4B proposed by the City of Ridgeland, with no explanation for this omission. And they submit that these facts, when considered in the context of the overall NEPA process, thoroughly undermine the NPS's insistence that it has complied with NEPA. The court, however, is hard-pressed to conclude that the factual underpinning constructed by plaintiffs might likely be judged sufficient to support their theory that the NPS never seriously considered any alternatives that provided for keeping Old Agency Road open, and that the

§ 1502.14 Alternatives including the proposed action. This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall: (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits. (c) Include reasonable alternatives not within the jurisdiction of the lead agency. (d) Include the alternative of no action. (e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference. (f) Include appropriate mitigation measures not already included in the proposed action or alternatives. 40 C.F.R. § 1502.14.

FSEIS does not reflect a genuinely deliberative process but rather represents instead merely NPS's post hoc justification for its decision to close Old Agency Road. That is, while plaintiffs insist that these claimed facts tend to show, at least circumstantially, that the revised proposed plan was a foreordained conclusion, the court is not persuaded. Nor is it persuaded that the NPS's alternatives analysis was otherwise insufficient.

*Alternative 4:* Of the six alternatives selected by the NPS for detailed study in the FSEIS (including the revised proposed plan), only one, Alternative 4, provided for keeping Old Agency Road open. Like the revised proposed plan, Alternative 4 called for construction of an Old Agency Road Relocated running south of the parkway motor road from near Whippoorwill Lane to Highland Colony Parkway; but rather than the parkway road crossing Old Agency Road at grade, Alternative 4 called for constructing a 340 foot long, 23 foot high parkway bridge over Old Agency Road and leaving Old Agency Road intact and open. Plaintiffs submit that since there was no engineering or other legitimate need for a bridge of the size and design included in Alternative 4, then it would seem to follow that this obtrusive bridge was included in the design for no other reason than to render Alternative 4 patently objectionable. The NPS went even further, they claim, and depicted the bridge in the drawing of Alternative 4 in the Draft and Final Supplemental Environmental Impact

Statements in a manner purposefully designed to poison the public review and sway public opinion against the alternative. The court rejects plaintiffs' position, for in the court's opinion, plaintiffs' assertion that the NPS has offered no explanation, or engineering justification for what they characterize as the needlessly long, obtrusive bridge in Alternative 4 is belied by a review of the FSEIS.

The Consultation and Coordination section includes the NPS's response to this very objection by Ridgeland Mayor Gene McGee:

> *Comment:* The bridge shown in the alternative 4 graphic on page 18 of the *Draft Supplemental Environmental Impact Statement* indicates an exaggeratedly long Natchez Trace Parkway bridge crossing Old Agency Road. The bridge appears unnecessarily and considerably longer than the other bridge alternatives. The drawing also indicates that the bridge would span the proposed closed entrance to Dinsmor.

The NPS responded to this comment with an explanation that "because of the flat skew angle [at which the parkway road must cross Old Agency Road], the bridge under Alternative 4 must have a longer center span to minimize construction impacts on Old Agency Road, and to preserve as much of the tree canopy cover as possible," [9] and thereby retain as much of the integrity of the historic setting as possible.

---

9. The response actually included much greater detail, stating that whereas at road crossings, engineers typically design bridges to cross perpendicularly, allowing for a shorter bridge with a thinner bridge deck that does not need the support of beams or girders, because of where Old Agency Road lies in the project area, it is not possible to do this; that in Alternative 4, the parkway road would cross Old Agency Road at a thirty degree angle (rather than the typical ninety degree angle), i.e., an extremely flat angle, thus ne-

cessitating a longer bridge; that approach fills at the bridge abutments would have to be far enough back from Old Agency Road so that the fills not encroach on that roadway; and that whereas retaining walls might be an option to mitigate the approach of road fills on Old Agency Road, they can be expensive to construct and maintain, would visually impact Old Agency Road and would result in construction impacts to Old Agency Road and the tree canopy.

Moreover, the actual dimensions of all the bridges proposed in all the alternatives, including Alternative 4, are plainly set forth in the discussions for these alternatives. The summary section, as well as the section detailing the major construction elements for Alternative 4, set forth as one such element "a parkway bridge over Old Agency Road approximately 103.7 meters (340 ft.) long and 7.0 meters (23 feet) high." The graphic depiction of Alternative appearing on the same page contains the notation "N.T.S.", or "not to scale." Considering the information and explanations contained in the FSEIS pertaining to Alternative 4, the court is not persuaded that the NPS purposefully sought to design or depict that alternative in a manner that would ensure its rejection.

*Waggoner Alternative 4B:* Regulations by the Council on Environmental Quality (CEQ)[10] provide that "for alternatives which were eliminated from detailed study, [the environmental impact statement must] briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a); *American Rivers v. F.E.R.C.,* 187 F.3d 1007, 1020 (1999), *vacated on other grounds,* 201 F.3d 1186 (9th Cir.1999) (emphasizing that the discussion need only be brief); *City of Carmel–By–The–Sea v. United States Dep't of Transp.,* 123 F.3d 1142, 1155 (9th Cir.1997) (stating that "both the choice of alternatives as well as the extent to which the EIS must discuss each alternative" is guided by the "rule of reason"). Plaintiffs insist that Waggoner Alternative 4B was manifestly a reasonable alternative, particularly in that it remedied what was patently objectionable about NPS's Alternative 4, and that the

NPS's failure to analyze this alternative in detail, or to discuss the reasons it chose not to do so, renders the FSEIS inadequate, and reflects a lack of genuine evaluation of alternatives.

Obviously, the FSEIS contains no detailed analysis of Waggoner Alternative 4B. The question is whether it adequately explains why this is so; and in the court's opinion, it does. That is not to say that the FSEIS addresses Waggoner Alternative 4B directly; it does not. However, the Consultation and Coordination section of the FSEIS includes the NPS's response to a comment by the Old Agency Road Historic Preservation Society, Inc., that specifically addresses this subject.

*Comment:* Statements on pages 105, 106, and 115 of the *Draft Supplemental Environmental Impact Statement* indicate that the bridge in alternative 4 would "visually intrude on the historical setting of the road corridor" and "irreversibly intrude on the historical setting of the historic Old Natchez Trace." Analyze the effects of a smaller, scenic bridge further west. It is believed such a bridge would preserve the historical setting.

*Response:* The National Park Service does not believe that such a bridge would preserve the historical setting. The tree-lined tunnel appearance would be visually impacted by *any* bridge crossing over Old Agency Road from either direction. Constructing a bridge and approach fills would impact trees adjacent to Old Agency Road, as explained in the response to comment 4. Any bridge crossing Old Agency Road would visually intrude on the historical setting of the road corridor and would irreversibly intrude on the historical setting of the historic Old Natchez Trace.[11]

---

**10.** "Preparation of the [FSEIS] was governed by NEPA and by the regulations enforcing it promulgated by the Council on Environmental Quality (CEQ) because CEQ regulations

implementing NEPA are binding on all federal agencies." *Sigler,* 695 F.2d at 964.

**11.** This concern also appears on page 176 of the FSEIS, where the NPS, responding to

The only feature of Waggoner Alternative 4B which plaintiffs submit distinguishes it from the NPS's Alternative 4 in a meaningful way is that the bridge proposed in the Waggoner Alternative is smaller, "context sensitive" and, according to plaintiffs, unobtrusive.[12] But as is plainly reflected in the FSEIS, the NPS is of a different view as to the obtrusiveness of a parkway bridge over the Old Natchez Trace/Old Agency Road.[13] Notwithstanding the parties' difference of opinion, however, the court is of the view that the NPS's explanation as to its rejection of a parkway bridge alternative—*any* parkway bridge alternative—satisfies the "discuss briefly" standard of 40 C.F.R. § 1502.14(a) and the rule of reason.

*The Plan Remained the Same:* In further support of their suggestion that the process of evaluation was not deliberative, plaintiffs point out that the NPS's decision in 1978 was to close Old Agency Road, and that more than twenty years later, after several public meetings, countless comments and numerous meetings with state and local agencies and individuals, most of whom adamantly opposed closure of Old

Agency Road, the plan, for all practical purposes, remained the same. The court, though, is not persuaded by the simple fact that the NPS, after the FSEIS process, arrived at the same conclusion that it had after its evaluation twenty years prior, that the agency's process of evaluation was not, in fact, genuinely deliberative. Stated another way, the plaintiffs' position is not supported by the fact that the NPS's judgment as to the best alternative did not change with further analysis and input.

In sum, the court, having considered all the plaintiffs' arguments and evidence on this point, is not persuaded as to their likely merit. Plaintiffs' have given the court "no persuasive reason for concluding that the [FSEIS] was a post-hoc justification of a foreordained decision, or that the [FSEIS] was anything but a serious and thorough consideration of the impact of this proposal on the environment." *City of Richfield, Minn. v. F.A.A.,* 152 F.3d 905, 907 (8th Cir.1998). Thus, plaintiffs have not shown, in the court's opinion, that they are likely to succeed on the merits of this claim.

---

another comment regarding the location of the parkway road within the project area, explained:

> There are few feasible alternatives for leaving the entire section of Old Agency Road open. A parkway bridge over Old Agency Road would significantly impact the present tree-canopied appearance of Old Agency Road.
>
> . . .
>
> The tree-lined tunnel appearance would be visually impacted by a parkway bridge crossing over Old Agency road because constructing a bridge and approach fills would require the removal of adjacent trees.

**12.** So far as the court can discern, plaintiffs do not suggest that the environmental implications of the Waggoner Alternative 4B bridge would be any less adverse than that proposed in the NPS's Alternative 4. *See Custer County Action Ass'n v. Garvey,* 256 F.3d 1024, 1039–40 (10th Cir.2001) ("What is required is information sufficient to permit a reasoned choice of alternatives *as far as environmental aspects are concerned.*") (emphasis added).

**13.** It strikes the court that plaintiffs' insinuation that the NPS's purported explanation is not legitimate is belied, at least to some extent, by the Waggoner Report's assessment of Alternative 4B, which states, under the heading, "Historic Concerns," that "[s]till, the alternative must include the disrupting influence of the Natchez Trace bridge over Old Agency Road near the Dinsmor entrance," and which, under the heading, "Vegetative Concerns," states,

> Arch Bridge will impact more vegetation in the Old Agency Road vicinity due to increased quantities of fill associated with the shorter bridge. This can be off-set by appropriate landscaping and berming to screen the shorter bridge and minimize negative visual impacts.

■ *The "No Action" Alternative:* Among the alternatives an EIS is required to evaluate is the alternative of "no action," 40 C.F.R. § 1502.14(d), which provides the standard by which the reader may compare the other alternatives' "beneficial and adverse impacts related to the applicant doing nothing." *Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1453 (9th Cir.1984). In other words, "[i]n requiring consideration of a no-action alternative, the [CEQ] intended that agencies compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo. In other words, the current level of activity is used as a benchmark." *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001).[14]

In this case, a draft and final EIS on proposed construction to complete the Natchez Trace Parkway was prepared in 1978. The 1978 FEIS included as a "no action" alternative the alternative of not completing the Natchez Trace Parkway, which the NPS rejected. The 2001 FSEIS, rather than using as the "no action" alternative of not undertaking this project, uses as its "no action" alternative the proposed alternative selected by the NPS in the 1978 FEIS. In other words, the FSEIS uses as the baseline for evaluating the environmental impact of the project the alternative of completing the parkway project as it was proposed in 1978 rather than the alternative of not completing the parkway at all.

■ Plaintiffs maintain that the NPS is fatally deficient for its failure to include a true "no action" alternative. Their challenge thus raises the question whether the putative "no action" alternative in the FSEIS is a legitimate "no action" alternative. The court, having considered this issue, is of the view that plaintiffs' argument regarding the omission from the FSEIS of a true "no action" alternative elevates form over substance. It is true that the 2001 FSEIS does not include as one of the considered alternatives the alternative of not completing the project; but the FSEIS *supplements* the original EIS, in which the NPS considered, but rejected, the "no action" alternative of not completing the project. The NPS contends, and the court agrees, that the FSEIS merely builds upon that base EIS. Thus, this is not a case in which the NPS altogether failed to consider the alternative of not completing the project. It did so in the original EIS and concluded that "no action" did not constitute a reasonable alternative under 40 C.F.R. § 1502.14(a). It is not disputed that the NPS's decision as to the relative need to complete the parkway did not change between its preparation of the original EIS and the FSEIS, the purpose of which was to evaluate, in light of public interest and debate over the particulars of the project, whether the al-

14. The CEQ has explained as follows regarding the "no action" alternative:

> 3. Q. What does the "no action" alternative include? If an agency is under a court order or legislative command to act, must the EIS address the "no action" alternative?
>
> . . .
>
> A. "No action" in [in instances involving federal decisions on proposals for projects] would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward. . . . [T]he regulations require the analysis of the no action alternative even *if the agency is under a court order or legislative command to act.* This analysis provides a benchmark, enabling decisionmakers to compare the magnitude of environmental effects of the action alternatives.

Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed.Reg. 18,-026, 18,032 (1981).

ternative the NPS had already selected for completion of the project remained, in fact, an appropriate alternative.[15] *Cf.* NPS Director's Order Handbook # 12, § C(3) (stating, *"Impacts of no action.* If the proposal is to modify a plan, the impacts are the impacts of the unmodified plan."). Accordingly, the court concludes that plaintiffs have not demonstrated a likelihood of success on the merits on the basis of this argument.

## 2. Wetlands Impact:

■ Under applicable CEQ regulations, NEPA's requirement that an EIS include a detailed statement regarding adverse environmental effects that cannot be avoided[16] encompasses a duty to discuss measures to mitigate adverse environmental requirements "in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson,* 490 U.S. at 351–53, 109 S.Ct. at 1846–47; *Mis-*

*sissippi River Basin,* 230 F.3d at 176 (stating that "agencies must provide a discussion of actions that can be taken to mitigate adverse environmental impacts to guarantee that agencies have seriously contemplated the environmental consequences of proposed federal projects"); 40 C.F.R. § 1502.16(h).[17] CEQ regulations define mitigation to include:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

---

15. While the court would not characterize as disingenuous plaintiffs' objection to the FSEIS on this point, it does bear repeating that neither plaintiffs, nor apparently anyone else who has publicly commented on this project, contends that the alternative of no action is a reasonable alternative. On the contrary, the plaintiffs are insistent that they are entirely supportive of completing the parkway and want to see this accomplished.

16. *See* 42 U.S.C. § 4332(2)(C)(ii).

17. This regulation states, in relevant part, that the discussion in an EIS must include

the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented.... It shall include discussions of:

(a) Direct effects and their significance (§ 1508.8).

(b) Indirect effects and their significance (§ 1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See § 1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under § 1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

40 C.F.R. § 1502.16.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

40 C.F.R. § 1508.20. The loss of wetlands is an adverse environmental impact, and as such, must thus be addressed in an agency's EIS.

As regards the project at issue, although NPS proposes that "[a]ll possible wetland avoidance and minimization measures will be incorporated into the design of this parkway construction project," and that "best management practices will be used to minimize impact to wetlands," the FSEIS recites that of the approximately 10.5 acres of wetlands that exist within the project area, approximately ten percent, or 1.71 acres, of wetlands, would be unavoidably lost as a result of the proposed construction as the result of road fills or cuts. The FSEIS, and in particular the Statement of Findings (SOF) included therein,[18] explains that because of the narrowness of the project area corridor, and because for the most part, wetlands within the project area run perpendicular to any path the parkway might take, it is nearly impossible to align the parkway as it passes through this area so to avoid all wetlands. Thus, all practical alternatives considered and evaluated by the NPS impact wetlands in the area to some extent, and to a substantially equivalent extent.[19]

The SOF goes on to recite the following:

The narrow linear nature of this segment in the parkway does not provide adequate space of conditions for the replacement of wetlands within the parkway itself. There is insufficient opportunity for mitigating impacts attributed to this project on lands managed by the National Park Service in either the same watershed or in another watershed within the Natchez Trace Parkway boundaries. Similarly, there is insufficient opportunity for mitigating wetlands impacts from the proposed project on other NPS lands in Mississippi. However, opportunities to mitigate the wetland impacts of this project do exist at Jean Lafitte National Historical Park and Preserve in Louisiana.

It then describes the Barataria Preserve unit of the Jean Lafitte Park and Preserve, and opportunities for wetlands restoration in that unit, and states, "As funding for this project is finalized and construction drawings are prepared, a wetland restoration plan will be developed by the National Park Service at the Jean Lafitte National Historic Park and Preserve" setting forth the details of the compensation plan.

While plaintiffs broadly challenge the sufficiency of the FSEIS as it relates to the subject of wetlands, they do not dispute NPS's assessment that loss of an equivalent amount of wetlands is unavoidable, irrespective of the alternative chosen.[20] In fact, plaintiffs do not deny that

18. NPS policy states that "[a]ctions proposed by the NPS that have the potential to have adverse impacts on wetlands will be addressed in an *Environmental Assessment* (EA) or an Environmental Impact *Statement* (EIS). If a preferred alternative in an EA or EIS will result in adverse impacts on wetlands, a 'Statement of Findings' documenting compliance with this *Director's Order* and implementation procedures will be completed...." NPS Procedural Manual # 77–1, § 2.5.

19. For example, Alternative 1 would impact 1.5 acres of wetlands; Alternative 5 would

impact 1.4 acres; and Alternatives 2, 3 and 4 would each impact 1.7 acres of wetlands.

20. The court again notes that although plaintiffs challenge the FSEIS on the ground that its alternatives analysis fails to adequately evaluate entirely reasonable alternatives, they do not contend that their proposed alternatives, or any other alternatives that the NPS failed to consider, had any less an adverse effect on wetlands than the proposals considered by the NPS.

their preferred alternative for construction of the parkway would result in as much or more wetlands loss than the NPS's revised proposed alternative. Nor do plaintiffs suggest that the NPS failed sufficiently to consider the possibility of on-site mitigation. On the contrary, their own witness, Anna Schoonover, testified that "there doesn't appear to be any opportunity to mitigate there." What plaintiffs do contend is that the FSEIS does not contain an adequate plan for compensatory mitigation in the face of this unavoidable wetlands loss. In this regard, they assert that the FSEIS does not reflect adherence by the NPS to applicable regulations governing mitigation in that the proposal for mitigation, such as it is, does not demonstrate consideration by the NPS of the mitigation requirements of other pertinent government agencies, and in particular those of the U.S. Army Corps of Engineers (the Corps) or the Mississippi Department of Environmental Quality, nor does it indicate that the NPS even followed its own policies in devising its mitigation plan.

Under § 404 of the Clean Water Act, the Corps has jurisdiction over wetlands, including wetlands on lands managed by the NPS. Under the Act, any discharge of dredged or fill materials into "navigable waters," which includes wetlands, is forbidden unless authorized by a permit issued by the Corps pursuant to § 404. *U.S. v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 123, 106 S.Ct. 455, 457, 88 L.Ed.2d 419 (1985). A 1989 Memorandum of Agreement between the Corps and the Environmental Protection Agency, which defined EPA guidelines for the Corps to apply in issuing permits under § 404, had two principal effects: (1) it established a national policy of no net loss of wetlands, in accordance with a directive from Presi-

dent George H. Bush; and (2) it established a sequencing scheme of addressing wetlands impacts, requiring first, that the § 404 permit applicant avoid wetlands impacts, where reasonably possible; that it minimize impacts where unavoidable; and lastly, that it compensate for any loss of wetlands by creating or replacing at least as many acres of wetlands as would be impacted by the development project in order to prevent any net loss of wetlands, *Moore v. United States*, 943 F.Supp. 603, 605–06 (E.D.Va.1996), basing compensation for unavoidable impacts on the following criteria:

1. On-site compensatory mitigation is preferred over off-site mitigation;

2. If off-site compensatory mitigation is not practical, the mitigation should take place within the geographic region/watershed;

3. In-kind compensatory mitigation is preferred over out-of-kind mitigation; and

4. Wetlands restoration is preferred over man-made wetlands due to a greater likelihood of success.

The NPS has adopted its own wetlands mitigation policy to carry out the goal of "no net loss" of wetlands. Like the Corps MOA, the NPS's Procedural Manual # 77–1 on Wetland Protection establishes a sequencing process for wetlands mitigation, requiring first avoiding wetlands impacts to the extent practicable; minimizing impacts that cannot be avoided; and compensating for remaining unavoidable adverse wetland impacts via restoration of natural wetland functions "in degraded or former natural wetland habitats on NPS lands" at a minimum ratio of 1:1 [21] and with the focus on "replacing wetlands of equivalent type and function, to the extent practica-

---

**21.** The Manual establishes a 1:1 compensation ratio as the "minimum" requirement, but recognizes that "[f]inal compensation ratios may need to be greater than 1:1" in some circumstances.

ble." NPS Procedural Manual # 77–1, § 2.4.

The NPS's Procedural Manual provides that

> [w]etland compensation sites must be on lands managed by the NPS, with the following recommended priority order: 1) within the same wetland system as the impacted wetland; 2) within the same watershed; or 3) in another watershed within the same NPS unit. If no practicable restoration sites can be found within this location sequence, then sites in other NPS units within the Cluster or Region may be considered. Practicability factors such as those discussed in Section 5.3.A.2 should be considered in determining appropriate compensation sites. For example, lack of opportunities may make local restoration impossible in some cases, and the decision to expand the area of consideration for compensation sites is clear. However, there may be other cases where local restoration sites exist, but factors such as the opportunity to restore a rare or critical wetland type in another watershed may outweigh the value of restoring a more local wetland.

Concerning the interrelationship between NPS mitigation requirements and those of other relevant federal agencies, the Manual states that the NPS policies, requirements and standards are to "be used in conjunction with the Department of the Interior procedures and policies for implementing E.O. 11990 (520 DM 1); the Council on Environmental Quality (CEQ) Implementing Regulations for NEPA (40 C.F.R. Part 1500); the Department of the Interior policies and procedures for complying with NEPA (516 DM 1–7); and NPS NEPA Director's Orders and implementation procedures." NPS Procedural Manual # 77–1, § 3.1.

Recognizing that NPS activities will at times require a Corps wetlands permit, the Manual states:

> **[A]ll NPS actions with the potential to have adverse impacts on wetlands (as defined by Cowardin et al., 1979) must comply with [D.O. # 77–1] and these procedures, and those actions that involve placing dredged or fill material in wetlands or other "waters of the U.S." (as defined in 33 CFR 320–330) must comply with Section 404 of the Clean Water Act as well.** In cases where both NPS and Corps of Engineers procedures apply, it is important to avoid duplication of effort by coordinating with the appropriate Corps of Engineers office early in the process of developing alternatives to assure that they are workable under both these procedures and Section 404 regulations. Also, if wetland compensation is necessary (Section 5.2.C of these procedures), **every effort should be made to assure that the same wetland restoration proposal meets the compensation requirements of both processes.** If, despite previous coordination, the Corps of Engineers requires changes in project design, location, or permit conditions after NPS NEPA documents (including the Statement of Findings discussed in Sections 5.3.D and 5.3.E of these procedures) are final, it may be necessary to amend the NPS documents to reflect these changes.

This brings the court back to plaintiffs' arguments.

■ Plaintiffs submit that the FSEIS, and the SOF included therein, do not contain the required reasonably complete discussion of the NPS's proposal for compensatory mitigation. They point out that in derogation of the NPS's own policy, there has been no coordination by the NPS with the Corps. They further argue that the

NPS plainly has not considered all reasonably available options for compensatory mitigation since the only source of compensation considered by the NPS is property owned by the NPS itself; and they submit that even if that could be considered sufficient, the FSEIS merely recites that there is insufficient opportunity to mitigate the wetlands loss on lands owned by the NPS in the same watershed or on other lands owned by the NPS within Mississippi and does not detail the process by which the NPS came to this conclusion. In a related vein, they argue, finally, based principally on testimony of Anna Schoonover, an expert in wetlands policies and regulations, that the NPS's proposal for mitigation is inadequate because the Corps is not likely to issue a § 404 permit since the NPS proposes compensation not only out of the same watershed, but out of the same state.

In the court's opinion, plaintiffs' objection that the NPS's mitigation plan is insufficient because it does not consider non-Park Service sites would not appear well taken, for that is precisely what is required by NPS policy. Further, as the NPS notes, more "detail" in the FSEIS or SOF as to the NPS's efforts to identify suitable candidates for compensation in the same watershed or in Mississippi would not change the fact that the NPS found no suitable mitigation sites on land owned by it in the State of Mississippi.

Moreover, it does appear to the court, having considered their arguments, that plaintiffs are, in effect, taking the position that the NPS has failed to fulfill NEPA's requirements since it has not included in the FSEIS a detailed mitigation plan that is assured of § 404 permit approval by the Corps. But that is not what NEPA requires.

▆ NEPA does require that an EIS contain a detailed discussion of steps that can be taken to mitigate adverse environmental consequences. *Robertson,* 490 U.S.

at 352, 109 S.Ct. at 1846. *See also Carmel–By–The–Sea,* 123 F.3d at 1153–54 (stating that an EIS "cannot omit a reasonably thorough discussion of mitigation measures because to do so would undermine the action-forcing goals of the National Environmental Policy Act"). However, an EIS need not contain a "complete mitigation plan" that is "actually formulated and adopted." *Robertson,* 490 U.S. at 352, 109 S.Ct. at 1846. As the court recognized in *Robertson,* "there is a fundamental distinction ... between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." 490 U.S. at 352, 109 S.Ct. at 1846. "Even more significantly," the Court said, it would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act." *Id.* at 353, 109 S.Ct. at 1847. *See also Mississippi River Basin,* 230 F.3d at 176–77 (quoting *Robertson* ); *Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.,* 42 F.3d 517, 528 (9th Cir.1994) (stating that "NEPA does not require a fully developed plan that will mitigate all environmental harm before an agency can act; NEPA requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated").

The SOF in the FSEIS specifically recognizes that

> The U.S. Army Corps of Engineers will review the parkway design drawings and wetland delineation report prior to construction. Authorization to fill wetlands is being requested by the Federal High-

way Administration. Mitigation requirements are anticipated.

An individual permit will be required from the U.S. Army Corps of Engineers to fill 0.69 ha (1.71 ac) of wetlands in the project area.

The FSEIS here contemplates that a Corps permit will be required and that therefore, a permit application will be made once a plan has been finalized. When a permit application is actually made, the Corps will review the mitigation plan; and at that point, the Corps may find that the NPS's proposal for compensation is not acceptable. But in the court's opinion, the fact that the proposal has yet to receive Corps approval does not support the conclusion that the NPS has not discharged its duty *under NEPA* to explain in sufficient detail its mitigation proposal and the basis therefor.

Addressing a similar argument to that advanced by plaintiffs herein, the court in *City of Carmel–By–The–Sea v. United States Department of Transportation* stated:

> [A]ny remaining inaccuracies will be cured in the § 404 permit process under the Clean Water Act, 33 U.S.C. § 1344, and its implementing regulations, 33 C.F.R. Parts 320–330; 40 C.F.R. Part 230. Although publication of the Final Environmental Impact Statement/Report is an important step toward the realization of the proposed project, often it is not the final step. Before any wetlands can be removed from [the project area], the Federal Highway Administration and Caltrans must secure a permit from the Army Corps of Engineers under § 404 of the Clean Water Act. If the objecting agencies remain

opposed to the wetlands mitigation plan each can voice its concerns as the permit process evolves. *See United States v. Ellen,* 961 F.2d 462, 464 (4th Cir.1992) (the Army Corps of Engineers and Environmental Protection Agency have authority to make wetlands determinations under the Clean Water Act). Significantly, the critical letters from the Environmental Protection Agency and Army Corps of Engineers, cited above, were aimed at securing improvements in the mitigation plan prior to its submission for a permit. These letters did not attack the Final Environmental Impact Statement/Report as inadequate under the National Environmental Policy Act. We do not intimate here that further "process" necessarily alleviates an agency's duty under the National Environmental Policy Act. Rather *this scenario serves to highlight the distinction between the National Environmental Policy Act and the Clean Water Act: the former is procedural and is simply not as demanding as the Clean Water Act on the issue of wetlands.* See Dubois v. U.S. Dept. of Agriculture, 102 F.3d 1273, 1294 (1st Cir.1996) ("In contrast to [National Environmental Policy Act's] focus on process, the [Clean Water Act] is substantive, focusing upon the 'integrity of the Nation's Waters, not the permit process.'") (citation omitted), *cert. denied,* 521 U.S. 1119, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997).

123 F.3d at 1152.[22] These observations apply equally here, and command the conclusion that plaintiffs have not shown a substantial likelihood of success on the merits of their wetlands-based objections to the FSEIS.

---

**22.** The court is cognizant of the NPS policy of "coordinating with the appropriate Corps of Engineers office early in the process of developing alternatives to assure that they are workable under both these procedures and

Section 404 regulations." The court would not consider the NPS's failure to merely coordinate with the Corps as rendering the FSEIS inadequate for NEPA purposes.

### *Traffic Data Inaccuracies and Omissions:*

 In taking a "hard look" at the environmental consequences of a proposed action, CEQ regulations require a federal agency to use information of sufficiently "high quality" that an "accurate analysis" of the proposed action can be made. 40 C.F.R. § 1500.1. Plaintiffs submit that traffic volume data upon which NPS purported to have relied in the FSEIS is lacking in an empirical or statistical basis and, particularly when considered in view of recent empirical data compiled by the Central Mississippi Planning District, is patently inaccurate, which highlights the NPS's failure to make a truly informed assessment of the potential environmental consequences of its proposed action.[23] The court finds no merit in plaintiffs' position.

Regarding the allegedly incorrect traffic data, plaintiffs point out that the FSEIS reflects that information obtained from the Federal Highway Administration (FHWA) based on a 1999 count disclosed a daily traffic count of 10,000 vehicles on a particular segment of Old Agency Road.[24] At the hearing on plaintiffs' motion, Larry Smith, Director of Planning for the Central Mississippi Planning and Development District (CMPDD), testified that on reviewing the FSEIS, he found this 10,000 figure rather hard to believe, so the CMPDD initiated its own traffic count the week before the hearing; it determined that the highest volume on that part of the road was only 5,080 vehicles a day. While this evidence might tend to suggest that the data obtained by NPS from the FHWA was not accurate, it is not reasonable to conclude that the process in which the NPS engaged was flawed simply because certain data that was considered in the mix of information evaluated as part of the process may not have been accurate. Obviously, if traffic data was to be considered, it had to come from somewhere; and in the absence of there having existed some basis for NPS's having then viewed as suspect the traffic count data gathered by the FHWA—and there is nothing to suggest to the court that there was any such basis—NPS could reasonably have assumed the information was correct and utilized such information in evaluating alternatives.[25] Moreover, even assuming for the sake of argument that the traffic count data was inaccurate in that it reflected a significantly higher traffic volume than a true count would have shown, the court fails to discern how NPS's reliance on this data was arbitrary or capricious, or how such reliance, under the circumstances, could be said to have rendered its conclusion unreliable. In fact, at worst, NPS erroneously assumed a higher than actual volume of traffic on Old Agency Road, and yet still made a decision to close Old Agency Road in the face of arguments that it was a necessary traffic artery.

23. While plaintiffs' position has not necessarily been consistent on this point, as the court now understands their position, plaintiffs do not contend that the allegedly incorrect traffic count is in and of itself grounds for relief; rather they contend that this circumstance evidences that NPS's "deliberative" process was flawed.

24. The FHWA, as the entity which will be responsible for the actual construction of the parkway road, has recently been added as a party defendant to this action.

25. Plaintiffs have questioned whether this data in fact was generated by the FHWA, or whether it instead came ultimately from the Mississippi Department of Transportation (MDOT) since, according to Mr. Miller, the FHWA usually does not conduct traffic counts. Further, Mr. Miller questioned the reliability and accuracy of the methodology used by the MDOT in arriving at traffic count figures. But regardless of where the figures came from, there is nothing to suggest that the NPS did not, in fact, rely on figures generated by another government agency.

In a related vein, plaintiffs have argued that the FSEIS is inadequate because it fails to include consideration of all reasonably foreseeable conditions, factors and impacts of the proposed project, and in particular because the projected future traffic density analysis contained in the FSEIS fails to take into account the announcement of plans by Nissan to construct its manufacturing facility in Madison County (which the CMPDD) has forecast will double Madison County's population by 2020), and second, the announcement of "several" (as it turns out, two) new residential developments in the vicinity of the project, namely Greenwood Plantation and Highland Park of Ridgeland. Plaintiffs argue that these circumstances will likely cause significant growth in the volume of commuter traffic in the project area, with the attendant potential for significantly impacting standing traffic during commuter hours, air quality, traffic and transportation patterns, none of which has been taken into account by NPS. Plaintiffs have thus argued that only a re-analysis of the proposed project with this new information can determine whether environmental conditions will be impacted and if an alternative design should be considered. A federal agency has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions, *see* 42 U.S.C. §§ 4332(2)(A), (B); *Stop H–3 Ass'n v. Lewis*, 538 F.Supp. 149, 168 (D.C.Hawai'i 1982); and "at times supplementation is required," *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 372–73, 109 S.Ct. 1851, 1858–59, 104 L.Ed.2d 377 (1989). In particular, CEQ regulations "impose a duty on all federal agencies to prepare supplements to either draft or final EIS's if there 'are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'" *Id.* However, while "NEPA does require that agencies take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval,"

> [a]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made. (Only) [i]f there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t] the quality of the human environment" in a significant manner or to a significant extent not already considered, (must) a supplemental EIS ... be prepared. *Cf.* 42 U.S.C. § 4332(2)(C).

*Marsh*, 490 U.S. at 373–74, 109 S.Ct. at 1859; *see also Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir.1987) (stating that "not every new circumstance, however small, requires filing a SEIS; the new circumstance must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned"); *Presidio Golf Club v. National Park Service*, 155 F.3d 1153 (9th Cir.1998) (the new information must relate to potential environmental impacts, and greater growth or changes in economic conditions alone are not sufficient).

The court does not view the mere fact that residential developments are planned in the vicinity of the project as such a change in circumstances as would warrant preparation of a supplemental EIS. Neither is the court persuaded that plaintiffs have shown that construction of the Nissan plant might likely be found to constitute a basis for concluding that a supplemental EIS is required. Especially in view of plaintiffs' criticism of the

FSEIS's reliance on a traffic count number which they submit was twice the actual number, their criticism that the NPS failed to take into account a circumstance that could potentially have the effect of doubling the number of vehicles on that road would not seem well founded.

### *The National Historic Preservation Act:*

The National Historic Preservation Act protects historic properties such as buildings, objects, sites and districts that are listed or eligible for listing on the National Register of Historic Places, mandating that "[p]rior to the approval of any Federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking." 16 U.S.C. § 470h–2f.[26] The Act creates the Advisory Council on Historic Preservation (Advisory Council),[27] and in section 106, provides for a formal historic review consultation process with the Advisory Council, 16 U.S.C. § 407f.

Regulations promulgated by the Advisory Council broadly direct that federal agencies must "seek ways to avoid, minimize or mitigate any adverse effects on historic properties," 36 C.F.R. § 800.1, those being properties that are included in or eligible for inclusion in the National Register of Historic Places,[28] and further establish a process which agencies must follow toward that end. Specifically, the regulations require that a federal agency proposing activity that may adversely affect a historic resource must consult with the State Historic Preservation Officer, or

---

**26.** Section 106 of the National Historic Preservation Act provides,

> The head of any Federal department or independent agency having authority to license any undertaking shall, prior to ... the issuance of any license ... take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking.
>
> 16 U.S.C. § 470f.

**27** The Advisory Council, which is responsible for the implementation of NHPA § 106, consists of officials from federal and state government, historic preservation experts, and members of the general public. *Vieux Carre Property Owners, Residents and Assocs., Inc. v. Brown,* 948 F.2d 1436, 1440 n. 7 (5th Cir. 1991).

**28.** 36 C.F.R. § 60.2 identifies the effects of a National Register listing, stating, in part:

> The National Register is an authoritative guide to be used by Federal, State, and local governments, private groups and citizens to identify the Nation's cultural resources and to indicate what properties should be considered for protection from destruction or impairment. Listing of private property on the National Register does not prohibit under Federal law or regulation any actions which may otherwise be taken by the property owner with respect to the property.
>
> (a) The National Register was designed to be and is administered as a planning tool. Federal agencies undertaking a project having an effect on a listed or eligible property must provide the Advisory Council on Historic Preservation a reasonable opportunity to comment pursuant to section 106 of the National Historic Preservation Act of 1966, as amended. The Council has adopted procedures concerning, *inter alia,* their commenting responsibility in 36 CFR Part 800. Having complied with this procedural requirement the Federal agency may adopt any course of action it believes is appropriate. While the Advisory Council comments must be taken into account and integrated into the decisionmaking process, program decisions rest with the agency implementing the undertaking.

SHPO, in the affected state to identify any historic properties that may be adversely affected by the proposed federal action, 36 C.F.R. § 800.4,[29] to assess any adverse effects the project may have on historic resources, 36 C.F.R. § 800.1 & 800.6, and "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties," 36 C.F.R. § 800.6. Under the regulations, "[i]f the agency official and the SHPO ... agree on how the adverse effects will be resolved, they shall execute a memorandum of agreement (MOA)." 36 C.F.R. § 800.5(e)(4). If they fail to agree on the terms of a memorandum of agreement, the agency "shall request the [Advisory] Council to join the consultation...." *Id.* "If the SHPO terminates consultation, the agency official and the Council may execute a memorandum of agreement without the SHPO's involvement." 36 C.F.R. § 800.7.

Consistent with the NHPA and the Council's regulations, following the NPS's selection in 1978 of an alternative for completion of the parkway, a Memorandum of Agreement (MOA) was executed between the NPS and the Advisory Council which required that the NPS submit its plans for construction of any section of the parkway that might adversely affect portions of the Old Natchez Trace to the appropriate SHPO for review and comment prior to commencing such construction. The NPS thus began a process of consultation with the Mississippi Department of Archives and History, Mississippi's SHPO, relative to its planned construction of the parkway road through the project area at issue.

Both the NPS and the SHPO agreed that the Old Natchez Trace/Old Agency Road was a historic site eligible for inclusion in the National Register of Historic Places; but they disagreed as to the basis for such registration. The NPS maintained that the primary basis for the eligibility of the affected segment of the Old Natchez Trace/Old Agency Road was its 1790 to 1820 principal period of historic use as an overland route as a footpath, and proposed that it be registered on that basis. The SHPO, on the other hand, took the position that the historical significance of Old Agency Road rested in its continuous use as a transportation route from the 1700s to early 1800s when it was used as a footpath, continuing into the early 20th century, when it became used for motorized vehicles, and continuing on to its present use as a scenic motorway;[30] the SHPO thus proposed its registration on that basis.

Despite years of discussions between them, the parties could never come to an agreement on this matter; in 1995, the parties finally reached an impasse and the SHPO, citing their "difference of opinion," formally withdrew from the consultation process, following which the NPS, consistent with Council regulations, began direct consultation with the Advisory Council. Subsequently, in 1995, pursuant to application by the NPS, a 3.3 mile section of the Old Natchez Trace running west from Ridgeland to Livingston Road (including the section within the project area) was placed on the National Register of Historic Places. And ultimately, in March 2001, a Memorandum of Agreement was executed

---

29. "Adverse effect" is defined to include physical destruction of the property, alteration of the property, restoration of a property or a "change of the character of the property's use or physical features within the property's setting that contribute to its historic significance." 36 C.F.R. § 800.5(2).

30. The SHPO's letter to the NPS withdrawing from further consultation described the historical significance of Old Agency Road on the basis of its "continuing history through its original use as the Natchez Trace, its late 19th and early 20th century use as a rural plantation/farm road, and its current contribution as a scenic road in an urban area."

between the NPS and the Advisory Council, in effect, approving the NPS's revised alternative proposal, stating:

> The NPS will remove the pavement from the segment of Old Agency Road closed as a result of the Parkway motor road construction and will restore the appearance of the Old Natchez Trace to the period of its primary significance pursuant to previous treatments performed under the 1978 Environmental Impact Statement and the Final 2001 Supplemental Environmental Impact Statement for the construction of Section 3P13.
>
> The terms of this agreement shall cover all construction activities associated with the Parkway as it concerns the closure of the short section of Old Agency Road crossing the Parkway motor road alignment.

■ In the case at bar, plaintiffs insist that the NPS has failed to comply with the NHPA's requirements in that it has unjustifiably accounted for but a single facet of Old Agency Road's historical significance, rather than considering and undertaking to protect and preserve *all* of the features of Old Agency Road which warrant its protection as a historic site. Most importantly, they say, the NPS has failed to meaningfully consider the historic significance of the road's continuous use from the earliest days of the original Natchez Trace through to the present—it being one of the few such sections of the Natchez Trace that have remained in use throughout the years. They submit, therefore, that the NPS's proposal to take the road out of use under the guise of restoring the path of the road to its appearance during a limited period of its historical significance, cannot be countenanced under the NHPA.[31]

The court has carefully considered plaintiffs' arguments, and is keenly aware of their understandable angst over the NPS's decision to close a portion of Old Agency Road. However, because it appears that the NPS followed the procedures prescribed by and pursuant to the NHPA, the court cannot conclude that plaintiffs are likely to succeed on the merits of this claim. The NPS had a duty under the NHPA to allow the Advisory Council reasonable opportunity to comment on the proposed undertaking. Its duty, more particularly, was in to engage in a consultative process with the SHPO in the first instance; and it was specifically authorized to execute a memorandum of agreement without the SHPO's involvement if the SHPO withdrew from the consultation process. This is precisely what occurred. The applicable regulations specifically state,

> Having complied with this procedural requirement [of affording the Advisory Council the opportunity for comment] *the Federal Agency may adopt any course of action it believes is appropriate.* While the Advisory Council comments must be taken into account and integrated into the decision-making process, *program decisions rest with the agency implementing the undertaking.*

36 C.F.R. § 60.2(a) (emphasis added). The fact is, while plaintiffs disagree with the NPS's view as to the primary historic relevance of Old Agency Road/Old Natchez Trace and its decision with respect to this

---

**31.** "Rather than through APA review, a private right of action against an agency arises under 16 U.S.C. § 470w–4, which provides for the NHPA to be enforced 'in any civil action brought in any U.S. District Court by any interested person.'" *Vieux Carre Property Owners, Residents & Associates, Inc. v. Brown,* 875 F.2d 453, 458 (5th Cir.1989). Notwithstanding its finding of an implied private right of action under the NHPA, the Fifth Circuit in *Brown* applied APA standards of review on the merits, i.e., asking whether the agency's actions were arbitrary and capricious. *Id.* at 460.

project, the Advisory Council has been consulted, has implicitly accepted the NPS's position[32] and has explicitly endorsed the NPS's proposed plan to close a portion of Old Agency Road and return it to its 1800–era historical setting. Although the NPS was bound under the NHPA to consider the views "concerning [adverse] effects which have been provided by consulting parties and the public," 36 C.F.R. § 800.5,[33] the law does not require that the NPS agree with those views. No matter how misguided plaintiffs may view the NPS's conclusions, the governing law ultimately places that decision in the hands of the NPS.

As the SHPO observed when it withdrew from the § 106 consultation process, "in this particular situation involving the construction of Section 3P of the Natchez Trace Parkway there is no ideal solution. Whatever is done in the area will have a significant effect." Given the absence of evidence that the NPS failed to comply with the process dictated by the NHPA or that its decision in the end was arbitrary or capricious, the court is not in a position

to grant relief to plaintiffs. The fact that the NPS chose a solution other than that advocated by the SHPO, and by plaintiffs herein, is not a basis for finding a violation of the NHPA, or for the relief plaintiffs seek.

### Due Process:

 Under 40 C.F.R. § 1506.6(c), the NPS is required to "hold or sponsor public hearings whenever appropriate .... Criteria shall include whether there is ... substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing." Though they did not address this subject at the hearing, plaintiffs have contended that the NPS failed to conduct a public hearing with regard to its revised proposed plan even though it knew that there was substantial environmental controversy with respect to the proposed plan and substantial public interest in a public hearing. In the court's opinion, however, there can be no legitimate contention that plaintiffs were deprived of reasonable opportunity for comment on the plan and to have their

---

**32.** Since the Memorandum of Agreement executed between the NPS and the Advisory Council in 2001 addresses only the "Old Trace" period of Old Agency Road, plaintiffs speculate that in making its application for inclusion of this part of the Old Natchez Trace in the National Register, the NPS may not have provided the Advisory Council with complete information as to all the periods of historic significance and all the historic features of Old Agency Road. However, the record clearly reflects that although the SHPO withdrew from the consultation process, the Advisory Council was fully apprized of the SHPO's position as to the relevant historic attributes of Old Agency Road and was fully aware that the parties had divergent views on the subject. Indeed, plaintiffs' witness, Roger Walker, who was the review compliance officer with the Mississippi Department of Archives and History involved when the SHPO withdrew from the consultation process, testified unequivocally that the SHPO "did express our concerns to the council before we formally with-

drew" from consultation, through letters and otherwise, and that in fact, a representative of the Advisory Council met on-site with the parties before the SHPO formally withdrew, all in an attempt to try to reach a solution. Further, when the NPS commenced direct consultation with the Advisory Council, it advised of the reasons for the SHPO's withdrawal, namely, the parties' differences of opinion. Contrary to plaintiffs' insinuation, it does not appear that the NPS was less than forthcoming with the Advisory Council.

**33.** 36 C.F.R. § 800.5 states, in part,

In consultation with the SHPO/THPO and any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to identified historic properties, the agency official shall apply the criteria of adverse effect to historic properties within the area of potential effects. The agency official shall consider any views concerning such effects which have been provided by consulting parties and the public.

comments considered. Although there were no public hearings held after the revised proposed plan was published, numerous public hearings preceded publication of the draft plan for comment, and comments were received during the ninety-day period following publication of the draft EIS; only six comments were received during the 30–day period following publication of the Final SEIS, and the NPS adjudged that those comments raised no new issues. There simply has been no due process violation.

### CONCLUSION

For all of the foregoing reasons, the court concludes that plaintiffs have not established a likelihood of success on the merits of any of their claims for relief. The court is not unsympathetic to the position of the plaintiffs, nor by its conclusion does it impugn the legitimacy of their interest or the basis for their substantive differences with the NPS regarding this project. Ultimately, however, the relevant statutes and regulations vest substantive decision-making authority with the NPS; so long as the agency has complied with its duties under the challenged Acts—and it does appear from the evidence presented to date that it has—it is beyond the authority of this court to enjoin implementation of the NPS's decision.

Accordingly, it is ordered that plaintiffs' motion for preliminary injunction is denied.